**Robert A. BURT, et al., Plaintiffs,**

v.

**Donald H. RUMSFELD, in his official capacity as U.S. Secretary of Defense, Defendant.**

No. CIV.A. 3–03–CV1777 (JCH).

United States District Court, D. Connecticut.

June 9, 2004.

David N. Rosen, Rosen & Dolan, P.C., New Haven, CT, Alma Hadar, Andrew B. Kratenstein, Daniel Slifkin, Rebecca Nordhaus, Cravath, Swaine & Moore, New York, NY, for Plaintiffs.

William M. Brown, Jr., U.S. Attorney's Office, New Haven, CT, Alan S. Modling-

er, U.S. Department of Justice, Washington, DC, for Defendant.

Paul M. Dodyk, Cravath, Swaine & Moore, New York, NY, for Plaintiffs and Movants.

Robert J. Sickinger, Cummings & Lockwood, Stamford, CT, for Movants.

## RULING ON DEFENDANT'S RULE 12(B)(1) MOTION TO DISMISS

HALL, District Judge.

Defendant Donald Rumsfeld, sued in his official capacity as Secretary of Defense, moves under Federal Rule of Civil Procedure 12(b)(1) to dismiss the complaint against him for lack of standing and lack of ripeness. For the following reasons, the motion is denied.

## I. BACKGROUND

Since 1978, Yale Law School ("YLS") has prohibited discrimination on the basis of sexual orientation. Yale's Nondiscrimination Policy ("NDP"), which applies to all aspects of YLS life, provides:

> Yale Law School is committed to a policy against discrimination based upon age, color, handicap or disability, ethnic or national origin, race, religion, religious creed, gender (including discrimination taking the form of sexual harassment), marital, parental or veteran status, sexual orientation, or the prejudice of clients. All employers using the school's placement services are required to abide by this policy.

Employers who refuse to certify their compliance with the NDP are barred from school-sponsored recruiting services. Compl. at ¶ 2, 17.

In light of the military's regulations regarding gay and lesbian service members, popularly known as the "Don't Ask Don't Tell" policy, the Department of Defense has refused to certify its compliance with the Law School's NDP and has thus been denied the use of YLS's Career Development Office ("CDO") since 1978. Compl. at ¶ 28. Instead, the law school has offered military recruiters open access to classrooms and other meeting spaces on campus for informational sessions and other recruiting activities, including interviews, at the invitation of a student organization; open access to any student or student group to reserve a classroom or other meeting space for such a meeting at any time; and open access to student contact information.

In 1995, in light of policies like the YLS NDP, and related controversies over the presence of ROTC programs on university campuses, Congress enacted the Solomon Amendment, now codified at 10 U.S.C. § 983. Among other things, the Solomon Amendment denies certain categories of federal funding to institutions of higher education that prevent military recruitment on campus. The Amendment in its current form provides:

> **(b) Denial of funds for preventing military recruiting on campus.**—No funds described in subsection (d)(2) may be provided by contract or by grant (including a grant of funds to be available for student aid) to an institution of higher education (including any subelement of such institution) if the Secretary of Defense determines that that institution (or any subelement of that institution) has a policy or practice (regardless of when implemented) that either prohibits, or in effect prevents—
>
> (1) the Secretary of a military department or Secretary of Homeland Security from gaining entry to campuses, or access to students (who are 17 years of age or older) on campuses, for purposes of military recruiting; or

(2) access by military recruiters for purposes of military recruiting to the following information pertaining to students (who are 17 years of age or older) enrolled at that institution (or any subelement of that institution):

(A) Names, addresses, and telephone listings.

(B) Date and place of birth, levels of education, academic majors, degrees received, and the most recent educational institution enrolled in by the student.

The Department of Defense's original interpretive regulations limited loss of funding to the particular part of the university ("subelement") found not to be in compliance. In other words, if a subelement of a university, like a law school, denied access to military recruiters, then only that subelement would lose funding, not the entire institution. *See* 61 Fed.Reg. 7739, 7740 (Feb. 29, 1996). Further, the Amendment initially implicated only Department of Defense ("DoD") funding. Because law schools, unlike other segments of a university, are not recipients of large amounts of DoD funds, the Amendment in its initial form apparently provided little leverage to encourage law schools to change their recruiting policies.

In 1997, Congress extended the rule denying federal funds to apply to grants and contracts provided by the Departments of Labor, Health and Human Services, Education, and Transportation, as well as Defense. Pub.L. No. 104–208, 110 Stat. 3009 (1996), codified at 10 U.S.C. § 983. This extension threatened certain types of student aid, including Perkins Loans and work study funds. However, the applicable regulations continued to cabin the consequences of a subelement's failure to grant access to military recruiters to that subelement itself, such that non-compliance did not affect the larger university.

In the fall of 1999, Congress enacted further changes to the Amendment, this time to protect students of non-compliant university subelements by exempting funds "available solely for student financial assistance or related administrative costs." Department of Defense Appropriations Act of 2000, Pub.L. No. 106–79, 113 Stat. 1212 (1999). Congress also modified the statute's language to specifically apply to any "institution of higher education (including any subelement of such institution)." 10 U.S.C. § 983(c)(2), as modified by Pub.L. No. 106–65, § 549(a)(1) (1999).

After this change, the DoD adopted interim regulations, effective immediately, that defined an "institution of higher education" to include "all sub-elements of such an institution." Defense Federal Acquisition Regulation Supplement: Institutions of Higher Education. 65 Fed.Reg.2056 (Jan. 13, 2000). The effect of this redefinition imputed a subelement's violation to the entire university, such that a violation in any part of the university would put the funding of the whole university in jeopardy. 48 C.F.R. § 252.209–7005.

The DoD also extended the plain text of the Amendment in another way. Though the Amendment itself speaks only to schools that "in effect, prevent" military recruiting on campus, the DoD promulgated regulations requiring access "at least equal in quality and scope" to that afforded to other employers, if not identical. 32 C.F.R. § 216.4(c)(3). The plaintiffs allege that the DoD interprets this requirement to mandate that military recruiters receive the same or better access to university recruiting and its students. Compl. at ¶ 4.

Plaintiffs claim that since 2001, the Department of Defense has demanded not only that the military receive access to the YLS campus, "but also that the Faculty Members provide the military with the public association and endorsement neces-

sarily conveyed by allowing the military undifferentiated access to the [Career Development Office formal recruiting] program." Compl. at ¶ 12. This insistence conflicts with YLS's NDP, which requires all recruiting employers to sign a non-discrimination statement.

The current conflict between YLS and the DoD began with a several-year-long series of administrative exchanges between YLS staff and various military recruiting officers regarding the NDP. On December 17, 2001, Colonel Clyde J. Tate, III, U.S. Army, advised Yale University President Richard Levin, "I understand that military recruiting personnel have been inappropriately limited in their ability to recruit or have been refused student recruiting information at Yale University by a policy or practice of the Yale Law School." Colonel Tate advised Levin that "current statutes deny the use of certain federal funds" to institutions of higher education with a policy or practice of denying military recruiting personnel entry to campuses, and stated, "[t]his letter provides you an opportunity to clarify your institution's policy regarding military recruiting on the campus of Yale University as well as Yale Law School." *See* Letter of Col. Clyde Tate to Richard Levin, 12/18/01, Def.'s Mem. In Supp. Of Mot. To Dismiss ("Def.'s Mem."), Ex. B. Colonel Tate advised that, "based on this information, Department of Defense officials will make a determination as to your institution's eligibility to receive funds by grant or contract." *Id.*

A series of letters and meetings ensued, with military officials repeatedly categorizing YLS's NDP as not in compliance with the Solomon Amendment. On May 29, 2002, Colonel Tate informed President Levin, "Unless we receive new information from you by July 1, 2002, showing that policies and practices of your institution

have been modified to conform with federal requirements ... we will consider forwarding this matter to the Office of the Secretary of Defense with a recommendation of funding denial." Letter of Clyde Tate to Richard Levin, 5/29/02, Def.'s Mem., Ex. B. To temporarily avoid this funding loss (of over $300 million annually), the YLS faculty voted in 2002 to approve a "temporary" suspension of the NDP. Compl. at ¶ 28; Letter of Richard Levin to Colonel Mickey Miller, 9/26/02, Def.'s Mem., Ex. B.

Conflict between YLS and the military continued. In early 2003, the Army referred the controversy to the Department of Defense. A DoD representative assured President Levin that, "prior to any determination of ineligibility, the Department will be sending [Yale] a letter setting out its position on compliance with the Solomon Amendment, including exactly what Yale must do to be compliant." Letter from Richard Levin to Dr. David S.C. Chu, Undersecretary of Defense for Personnel and Readiness, 3/10/03, Def.'s Mem., Ex. B.

On May 29, 2003, the Office of the Under Secretary of Defense issued a letter by William J. Carr, Acting Deputy Undersecretary for Military Personnel Policy ("Carr letter"), opining that YLS and, by implication, Yale University, are in violation of the Solomon Amendment. The Carr letter set forth the applicable law and regulations and the DoD's interpretation, and explained that YLS was not complying with DoD regulations and was "in effect" preventing military recruiting on campus. Compl. at ¶ 13. Carr based this finding of noncompliance partially on his belief that the YLS policy "sends the message that employment in the Armed Forces of the United States is less honorable or desirable than employment with other organizations that Yale permits to participate in

CDO programs." *See id.* Carr further informed Yale that the NDP, despite its temporary suspension, "remains an obstacle to military recruiters and their ability to plan for, schedule, and gain access to Yale Law School students for the purpose of military recruiting." As such, Carr concluded, "Yale's policy is in violation of federal law," and advised Levin, "it is my duty under law to recommend to the Principal Deputy Under Secretary of Defense for Personnel and Readiness that Yale University be determined ineligible for Department of Defense funding." Carr gave notice that he would so notify on June 29, 2003, "unless you advice me before that date of a change in policy sufficient to overcome the deficiencies outlined above."

On October 16, 2003, forty-four YLS faculty members filed this suit. The faculty members allege that the Solomon Amendment and 32 C.F.R. 216.4(c)(3), which mandates that access to campus by military recruiters must be "equal in quality and scope," on their face, and as applied by the DoD to preclude YLS's NDP, violate the plaintiffs' First and Fifth Amendment rights. The plaintiffs also allege that the equal access requirement of 32 C.F.R. § 216.4(c)(3) is not a reasonable interpretation of the Amendment, and that in any case YLS is in compliance.

## II. DISCUSSION

The Secretary of Defense moves to dismiss the complaint against him under Rule 12(b)(1) for lack of standing and lack of ripeness. A court must dismiss a case for lack of subject matter jurisdiction under Rule 12(b)(1) when it lacks the statutory or constitutional power to adjudicate it. *See, e.g., Luckett v. Bure,* 290 F.3d 493, 496–97 (2d Cir.2002). "[T]he plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.* (internal quota-

tions omitted). Ripeness and standing are both properly considered on a Rule 12(b)(1) motion. *See Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 128 (2d Cir.2003) (discussing 12(b)(6) and 12(b)(1)); *Auerbach v. Board of Educ.,* 136 F.3d 104, 108–09 (2d Cir.1998); *Thompson v. County of Franklin,* 15 F.3d 245, 248 (2d Cir.1994). "In resolving the question of jurisdiction, the district court can refer to evidence outside the pleadings." *Luckett,* 290 F.3d at 496–97.

### A. Standing

The defendant first argues that the faculty members do not have standing to bring this suit, because the rights in jeopardy are in fact Yale's rights, not those of the YLS faculty. The plaintiffs insist that their own rights—rights to freedom of speech and association, and to due process of law—are at stake.

 In essence, the standing inquiry focuses on whether the plaintiff is the proper party to bring suit. *See Baur,* 352 F.3d at 632; *see also Becker v. Fed. Election Comm'n,* 230 F.3d 381, 386 n. 3 (1st Cir.2000) (noting that standing is assessed at the time of filing). This inquiry is "especially rigorous when reaching the merits of the dispute would force [the court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd,* 521 U.S. 811, 820, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). In order to have constitutional standing to pursue a claim, a plaintiff must demonstrate: (1) an injury in fact; (2) caused by the conduct complained of; (3) and that such injury is likely to be redressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *see also Lerman v. Board of Elections in City of New York,* 232 F.3d 135, 142 (2d Cir.

2000). The defendant has not contested redressability.

■ When standing is raised at the pleading stage, it is "subject to the same degree of proof that governs other contested factual issues." *Baur v. Veneman,* 352 F.3d 625, 632 (2d Cir.2003); *see also Lujan,* 504 U.S. at 566, 112 S.Ct. 2130 (allegation of injury may be sufficient to survive a motion to dismiss, even if, on a motion for summary judgment, the facts do not exist to support the allegation); *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 45 n. 25, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) (same); *cf. In re Bennett Funding Group,* 336 F.3d 94, 102 (2d Cir. 2003) (denial of motion to dismiss based on standing does not preclude raising the issue again at the summary judgment stage). This means that all facts averred by the plaintiffs must be taken as true for purposes of the standing inquiry. *Lerman,* 232 F.3d at 142. This favorable construction includes the presumption that the plaintiffs' general allegations of injury "embrace those specific facts that are necessary" to support the claim. As a result, general factual allegations of injury resulting from the statute and conduct challenged may suffice to establish the plaintiffs' standing. *Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130.

### 1. Injury–In–Fact

The defendant argues that the faculty members' First and Fifth Amendment claims do not allege a cognizable injury in fact. He contends that the plaintiffs' First Amendment "message" is conduct, not speech, and thus not "legally and judicially cognizable," Def. Mem. at 11, and that their Fifth Amendment claim does not allege injury to a "legally protected interest" and thus must fail. *Id.* In effect, the defendant argues that the plaintiffs do not

have standing because they cannot state a claim.

■ The essence of the standing "injury" requirement is that a plaintiff must "allege such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional issues." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). To qualify as a constitutionally sufficient injury-in-fact, the asserted injury must be "concrete and particularized," as well as "actual or imminent, not 'conjectural' or 'hypothetical.'" *See Baur,* 352 F.3d at 632 (quoting *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130). The court must assess whether the injury "affect[s] the plaintiff in a personal and individual way," *id.* (quoting *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130), and ensure that the plaintiffs' injury is not so abstract as to make the claim incapable of, or otherwise not suitable for, judicial resolution. *Id.*

■ Contrary to the defendant's arguments, the faculty have alleged a constitutionally sufficient personal injury. The complaint alleges that they, by majority vote, govern the law school and establish its rules and regulations. *See* Compl. at ¶ 11. It further alleges that the faculty voted to include discrimination on the basis of sexual orientation in its Non–Discrimination Policy in 1978, and that this long-standing policy represents both their own message about discrimination, and their own determination about the standards of conduct that should govern the law school community. According to the complaint, the faculty were compelled to suspend that policy because of the threats leveled at their institution by the Department of Defense, in violation of their rights to freedom of speech and association. They further allege that the effect of

the suspension is to impede the freedom of their relationships with their students, and to force them to participate in inflicting discrimination on those students. These alleged injuries are of a sufficiently "concrete" and "personal" nature to give the plaintiffs standing to pursue this action.

■ The defendant next argues that, even if the interest is "concrete," it is not "legally protected." *McConnell v. Federal Election Com'n*, 540 U.S. 93, 124 S.Ct. 619, 709, 157 L.Ed.2d 491 (2003) (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130). While this aspect of the standing inquiry "in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, . . . it often turns on the nature and source of the claim asserted." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (internal quotation marks and citations omitted)). Essentially, this requirement inquires, "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth*, 422 U.S. at 500, 95 S.Ct. 2197.

■ Courts have long recognized that the First Amendment can protect injuries to expressive conduct. *See Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931) (displaying red flag); *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (salute); *Brown v. Louisiana*, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (sit in); *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 504, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (black armbands); *Hurley v. Irish–Am. Gay, Lesbian, and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995) (parade is expressive activity). Here, the faculty allege that their enactment of the NDP, and their decision to apply it to all aspects of law school life, including the recruitment process, is protected speech. They further allege that the Solomon Amendment, the DoD's regulations, and the defendant's application of those regulations against Yale and YLS, has forced them to choose between the exercise of their constitutional rights and federal funding for themselves, YLS, and Yale University. These allegations set forth a cognizable First Amendment injury.

■ The right to expressive association is "implicit in the right to engage in activities protected by the First Amendment." *Roberts v. Jaycees*, 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). This right includes the right not to associate, and government actions that force "intrusion into the internal structure or affairs of an association" may unconstitutionally burden this right. *Id.* at 623, 104 S.Ct. 3244. The Supreme Court has observed that associational freedom is "crucial in preventing the majority from imposing its views on groups that would rather express other, perhaps unpopular, ideas." *Boy Scouts of America v. Dale*, 530 U.S. 640, 647–48, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000).

Plaintiffs allege that the DoD's actions have unconstitutionally forced them to allow military recruiters into their association, in violation of YLS's non-discrimination principles. They contend that they have a right to form and be part of an association that sends a particular message with regard to discrimination, and that because of the Solomon Amendment and the DoD's enforcement of it, they are not only required to associate, but effectively to adopt the military's discriminatory message by association, unless they speak out against it. This also states a cognizable First Amendment injury. *Id.* at 653, 120 S.Ct. 2446.

The plaintiffs' Fifth Amendment due process claim is more difficult. They contend that the Solomon Amendment, by requiring them to allow an employer on campus who discriminates against their students, "violat[es] the special relationship between student and teacher." Whatever the court's doubts about the due process claim under a Rule 12(b)(6) standard or on the merits, both the Supreme Court and Second Circuit have cautioned that a court may not pass a difficult jurisdictional issue in order to rule upon even an easy merits question. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94–101, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); *Center for Reproductive Law and Policy v. Bush,* 304 F.3d 183, 195 (2d Cir.2002) (court must reach jurisdiction unless "a controlling decision ... has already entertained and rejected the same constitutional challenge to the same provision"); *see also Warth,* 422 U.S. at 500, 95 S.Ct. 2197.

The Supreme Court has recognized, *albeit* in a limited circumstance, that the Fifth Amendment at times protects the teacher-student relationship. *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). The plaintiffs are teachers; whether or not their stated claim ultimately falls within the contours of the Fifth Amendment, they have articulated a right that has been found to be cognizable. As a result, the Fifth Amendment "can be understood as granting persons in the plaintiff[s'] position a right to judicial relief." *Warth,* 422 U.S. at 500, 95 S.Ct. 2197.[1]

## 2. Causation

The defendant's principal argument against the plaintiffs' standing to bring this suit rests on the causation requirement. The defendant argues that the real "victim" of any conduct on its part is Yale University, which has declined to bring a claim, and that the plaintiffs cannot bring claims on Yale's behalf. The court disagrees with the defendant's characterization of the ongoing injury at issue here.

In order to bring a constitutionally justiciable claim, a plaintiff must, at the pleading stage, allege that the injury was "caused" by the conduct complained of. *See Lujan,* 504 U.S. at 560, 112 S.Ct. 2130. Because the faculty plaintiffs allege that they, by majority, establish the rules and regulations that govern YLS, this makes them equivalent to YLS for the purposes of this causation inquiry. They thus allege an injury caused directly to themselves, as that YLS governing body. The plaintiffs allege that, as a result of threats aimed at their institution, and the associated ramifications for sister schools within Yale University, they have been forced to temporarily suspend the application of the NDP, in violation of their constitutional rights. Compl. at ¶ 4.

The record submitted by the defendant further makes clear that the Army and the

---

1. The complaint also suggests that the faculty members attempt to raise the Fifth Amendment equal protection rights of their students. This would require the plaintiffs to demonstrate: (1) injury to the plaintiff; (2) a close relationship between the plaintiff and the third party that would cause the plaintiff to be an effective advocate for the third party's rights; (3) some hindrance to the third party's ability to protect his or her own interests. *Camacho v. Brandon,* 317 F.3d 153, 159–60 (2d Cir.2003). At oral argument, counsel conceded that the plaintiffs could not satisfy the hardship showing. Transcript 5/21/04 (Dkt. No. 47) at p. 66 l.24–25. The court thus treats any such third party claim, if articulated, as withdrawn.

In any case, the court has ruled that the students may pursue their own equal protection claims. *See* Ruling On Def.'s Rule 12(b)(1) Motion To Dismiss in *SAME, et al. v. Rumsfeld,* 03–cv–1867 (JCH).

DoD have consistently pointed to continuance or the permanent suspension of the NDP as the key indicator of Yale Law School's non-compliance or compliance with the Solomon Amendment. *See, e.g.,* Letter of Colonel Michele Miller to Richard Levin, 10/17/02, Def.'s Mem., Ex. B; Letter of Colonel Michele Miller to Richard Levin, 3/3/03, Def's Mem., Ex. B; Letter from William Carr to Richard Levin, 3/29/03, Def.'s Mem., Ex. B. This clearly alleges that their injury was "caused by" the conduct complained of. *See Lujan,* 504 U.S. at 560, 112 S.Ct. 2130. Because the Complaint, the parties' statements at oral argument, and the documentary evidence before the court all suggest that the plaintiffs have the authority to retain or suspend the NDP, the court does not consider Yale University to be a "third party" interposed between the DoD and the plaintiffs in this matter.

 Even if Yale University were to be considered such a "third-party," however, the plaintiffs would still have standing to pursue their claims.[2] While the defendant correctly notes that the causation required by Article III is not present where a plaintiff's injury results from the independent act of a third-party, the Supreme Court has cautioned the lower courts not to "wrongly equate[ ] injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Bennett v. Spear,* 520 U.S. 154, 169, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). The "fairly traceable" injury required by Article III may include "injury produced by determinative or coercive effect upon the action of someone else." *Id.; see also Bush,* 304

F.3d at 193. Here, the plaintiffs allege that they have been forced to suspend the NDP, in violation of their constitutional rights, because of the coercion of the DoD's threat to deprive itself and its sister schools at Yale University of federal funding. As a result, the plaintiffs' claimed injury is "fairly traceable" to the DoD's actions.

The plaintiffs therefore have standing to pursue their claims. The defendant's motion to dismiss for lack of standing is denied.

## B. Ripeness

The defendant also argues that this action should be dismissed because the DoD has not yet issued a final determination as to Yale. The plaintiffs reply that this argument would "allow the DoD to achieve its oppressive purposes while shielding its illicit actions from judicial review," Pls' Opp. at 17, and that "absent immediate judicial review, the Faculty Members will continue to be deprived of their constitutional rights." *Id.* at 18.

 Constitutional ripeness is "a doctrine that, like standing, is a limitation on the power of the judiciary. It prevents courts from declaring the meaning of the law in a vacuum and from constructing generalized legal rules unless the resolution of an actual dispute requires it." *Simmonds v. INS,* 326 F.3d 351, 357 (2d Cir.2003). "[T]he ripeness inquiry requires courts to consider both the fitness of the issues for judicial decision and the hardship resulting from withholding judicial consideration." *Marchi v. Bd. of Coop. Educ. Services,* 173 F.3d 469, 478–79 (2d Cir.1999) (citing *Abbott Lab. v. Gardner,*

---

2. Though Yale University is the primary victim of the imminent funding loss at issue here, the University, unlike the YLS faculty, appears to have no First Amendment rights in jeopardy (separate from the plaintiffs) in the matter as alleged. So, contrary to the defendant's argument, it is not at all clear that Yale University would be the preferred or even appropriate plaintiff here.

387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681); *see also Able v. United States*, 88 F.3d 1280, 1289–90 (2d Cir.1996).

The Second Circuit has considered a variety of factors in evaluating whether a case is ripe for adjudication: (1) whether the issue to be reviewed is more legal or factual in nature; (2) whether the agency action is likely to have an immediate and substantial impact upon the complaining party; (3) whether judicial review would delay or impede effective enforcement or the relevant administrative scheme; (4) whether the agency's actions are final, and (5) whether an adequate factual record has been established. *Id.* at 1289–90. The plaintiffs' facial challenge to the statute need not be finally "applied" to be ripe for review. *See id.* at 1289 (finding resort to administrative procedures unnecessary because "[i]n a facial challenge, we need only consider whether there are any circumstances under which the prohibitions of the Act are permissible in order to uphold the Act"); *Dougherty v. Town of N. Hempstead Bd. of Zoning App.*, 282 F.3d 83, 90 (2d Cir.2002) (citations omitted) (noting that facial First Amendment challenges implicate a somewhat relaxed standard for establishing the ripeness of a claim); *Marchi*, 173 F.3d at 478 (challenge that grows out of a "real, substantial controversy between parties" involving a "dispute definite and concrete" is ripe) (quoting *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895, (1979)).

 Similarly, the plaintiffs' challenge to the regulation, on its face, and their claim that it is an unreasonable construction of the Solomon Amendment, raises no ripeness problem. Here, the regulation is final. To challenge a regulation, the Administrative Procedure Act ("APA") requires a party to show that the regulation has caused the plaintiff some concrete harm; in some cases, this may be satisfied by the promulgation of the regulation itself. *See Reno v. Catholic Soc. Serv., Inc.*, 509 U.S. 43, 57, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993). Here, the regulation has presented plaintiffs with an "immediate dilemma," *id.*, and has further been applied to them by "some concrete action." *See Lujan v. Defenders of Wildlife*, 504 U.S. at 560, 112 S.Ct. 2130 (1992). The challenge to the regulation is thus ripe.

The plaintiffs' "as applied" challenge presents greater difficulty. They argue that the DoD's interpretation of the statute and regulation, as expressed in the Carr letter and as applied to Yale, is in error, in excess of the DoD's authority under the statute, and infringes their Constitutional rights. The defendant argues that, because federal agency action is involved, the standards of the APA are again implicated. The Principal Deputy has not definitively spoken and Yale's funding has not yet been ordered "terminated." Thus, the defendant argues, the action applying the regulation is not final, and the plaintiffs' claim is not yet ripe for adjudication.

 The APA requires that an agency action be final before it can be reviewed. *See Lunney v. United States*, 319 F.3d 550, 554 (2d Cir.2003) ("The APA authorizes only a challenge to a 'final' action of an 'agency.'"); *Air Espana v. Brien*, 165 F.3d 148, 152 (2d Cir.1999) ("The APA explicitly requires that an agency action be final before a claim is ripe for review."). The APA's finality requirement is implicated where a suit asks the district court to review the propriety of an agency action. *In re Combustion Equipment Associates, Inc.*, 838 F.2d 35, 38 (2d Cir.1988). This requirement is jurisdictional. *Air Espana*, 165 F.3d at 152. The ripeness inquiry avoids "piecemeal review which is at the least inefficient and upon completion of the agency process

might prove to have been unnecessary." *FTC v. Standard Oil Co. of California,* 449 U.S. 232, 242, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980). As a result, "[c]ourts traditionally have been reluctant to grant declaratory judgments when administrative determinations are involved unless the effects of the administrative action challenged have been felt in a concrete way by the challenging parties." *Reno,* 509 U.S. at 57, 113 S.Ct. 2485 (quoting *Abbott Labs.,* 387 U.S. at 148, 87 S.Ct. 1507) (internal quotation marks omitted).

 Agency action is "ripe," however, when "the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him." *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130. Especially where the First Amendment is involved, "where a party suffers a concrete injury prior to final administrative disposition, such as fines or unreasonable appeal fees, the claim may be considered sufficiently ripe." *Peachlum v. City of York,* 333 F.3d 429, 437 (3d Cir.2003). As the Third Circuit noted in *Peachlum,* "We reiterate that an 'as applied' free speech claim has never been deemed subject to administrative finality doctrine by our court or any other court of appeals." *Id. See also Dougherty,* 282 F.3d at 90 (First Amendment claims require special caution because of the danger of irretrievable loss if not adjudicated).

 This controversy, as it exists today, is the culmination of years of discussions and conflict between the DoD and Yale Law School. The DoD's letters state the Department's unwavering position that Yale's NDP is a violation of the Solomon Amendment, as construed by 32 C.F.R § 216.4(c)(3). Such letters can themselves have legal effect. *Cf. United States v. Mead Corp.,* 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (agency's interpretive letters entitled to some level of deference). To the extent that any further discussion between Yale and the DoD has ensued since May 2003, the letters submitted to the court indicate that their character has been one of adjustment on Yale's part, not of reconsideration by DoD of its position that at least some access to the CDO is necessary for compliance. *See, e.g.,* Letter from Charles Abell to Richard Levin, 12/23/03, Def.'s Mem., Ex. D.

Further, the DoD's action has worked "substantial hardship" on the plaintiffs and will continue to do so if judicial review is withheld. Letters from 2001 onward, culminating in the Carr letter and maintained in subsequent DoD letters, make clear the DoD's position that the YLS NDP puts Yale University's federal funding in peril. This forces the YLS faculty to chose whether to "stay silent" and "forever be barred from asserting [their] alleged free speech," *Able,* 88 F.3d at 1290, and due process rights, making the NDP suspension permanent and ensuring that the DoD's actions will never be reviewed, or whether to pursue those rights and cause the termination of their own federal funding and that of all other schools at Yale University.[3] The plaintiffs have endured this hardship, and the temporary suspension of what they allege are their constitutional rights, for almost two years, through several recruiting seasons. Further, the issues here are primarily legal: particularly, does the Amendment require equal access, and does the DoD's required abridge-

---

**3.** Plaintiffs' counsel represented during oral argument (and defendant's counsel did not dispute) that 166 law schools have, when faced with Carr-type letters, altered their poli-

cies and no "final" DoD action was necessary. Transcript, 5/21/04 (Dkt. No. 47) at p. 68 l.24 (plaintiffs' counsel) and p. 73 ll. 18–20 (defendant's counsel).

ment of the NDP violate the plaintiffs' rights? The controversy has thus developed to a point where judicial review is appropriate. *See Abbott Labs.*, 387 U.S. at 149, 87 S.Ct. 1507.

The gravamen of the defendant's argument is that the matter is not "final," and thus not ripe, until the Principal Deputy acts; however, as explained at oral argument, when the Principal Deputy acts, Yale will be listed as noncompliant and funding will be terminated almost immediately. Accepting the defendant's argument would thus be a decision that the plaintiffs' claims may only be brought on a last-minute Temporary Restraining Order, or, more likely, after Yale University has been deprived of over $300 million in federal funding. The court does not read the "ripeness" requirement to so confine plaintiffs' access to court under these circumstances. This controversy is ripe.

### III. CONCLUSION

For the reasons stated above, the defendant's Motion to Dismiss [Dkt. No. 12] is DENIED in part. The court reserves its Ruling on the Rule 12(b)(6) portion of that Motion.

**SO ORDERED.**