Robert A. **BURT,** et al, Plaintiffs,

v.

**Donald H. RUMSFELD, in His Official Capacity as U.S. Secretary of Defense, Defendant.**

**No. CIV.A.3–03–CV–1777(JCH).**

United States District Court, D. Connecticut.

Jan. 31, 2005.

See also 322 F.Supp.2d 189.

David N. Rosen, Rosen & Dolan, P.C., New Haven, CT, Alma Hadar, Andrew B. Kratenstein, Daniel Slifkin, Paul M. Dodyk, Rebecca Nordhaus, Cravath, Swaine & Moore, New York, NY, for Plaintiffs.

William M. Brown, Jr., U.S. Attorney's Office, New Haven, CT, Alan S. Modlinger, U.S. Department of Justice, Washington, DC, for Defendant.

## RULING ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 34] AND DEFENDANT'S MOTION TO DISMISS [DKT. NO. 12]

HALL, District Judge.

## I. INTRODUCTION

Members of the Yale Law School faculty [1] (hereinafter the "Faculty") [2] together

1. Professors Robert A. Burt, Owen M. Fiss, Harold Hongju Koh, Kenji Yoshino, Bruce Ackerman, Anne L. Alstott, Ian Ayres, Jack M. Balkin, Yochai Benkler, Richard R.W. Brooks, Amy L. Chua, Morris L. Cohen, Dennis E. Curtis, Harlon L. Dalton, Drew S. Days III, Brett Dignam, Steven B. Duke, William N. Eskridge, Jr., Daniel C. Esty, Daniel J. Freed, Robert W. Gordon, Michael J. Graetz, Oona A. Hathaway, Dan M. Kahan, Paul W. Kahn, Jay Katz, S. Blair Kauffman, Alvin K. Klevorick, Anthony T. Kronman, Carroll L. Lucht, Daniel Markovits, Jerry L. Mashaw, Jean Koh Peters, Robert C. Post, J.L. Pottenger, Jr., Judith Resnik, Carol M. Rose, Susan Rose–Ackerman, Vicki Schultz, Reva Siegel,

with *pro se* plaintiff YLS Professor Jed Rubenfeld ("Rubenfeld"),[3] have brought this action against Donald H. Rumsfeld, in his official capacity as the United States Secretary of Defense ("DoD" or the "Government"). This action arises out of DoD's application of the Solomon Amendment against Yale University as a result of a YLS non-discrimination policy.[4]

The Faculty, including Professor Rubenfeld, claim that the Law School is not in violation of the Solomon Amendment, codified at 10 U.S.C. § 983 (2004), which requires educational institutions to allow military recruiters access to their campuses and their students as a condition of receipt of most federal funds. They argue that YLS' recruiting programs occur off-campus and are thus beyond the scope of the Solomon Amendment. They also claim that military recruiters have the same opportunity to become eligible for the official recruiting programs, and therefore YLS is neither "effectively preventing" military recruiters from accessing YLS students through the programs, nor treating military recruiters different from non-military recruiters.

Alternatively, even if YLS is in violation of the Solomon Amendment, the Faculty argue that the court should declare the Solomon Amendment as applied unconstitutional because it places unconstitutional conditions on hundreds of millions of dollars of government funding granted to Yale University. By compelling them to officially aid the military's recruiting efforts, the Faculty claim that the Solomon Amendment violates their freedoms of speech and association and violates their substantive due process right of educational autonomy. Specifically, the Faculty argue that forced inclusion of military recruiters in YLS' official recruiting process compels them to communicate a significantly different message concerning employment discrimination than they choose to send, and that it forces them to associate with individuals whose publicly acknowledged beliefs are in conflict with those of YLS. Additionally, the Faculty argues that forced inclusion of military recruiters interferes with their substantive due process right to educational autonomy in creating an educational atmosphere at YLS that is free from discrimination and protects all YLS students.

Professor Rubenfeld advances a slightly different constitutional claim. He eschews the Faculty's freedom of association and educational autonomy claims. He presses only a First Amendment compelled speech claim. Unlike the Faculty's claim that inclusion of military recruiters compels them to change their message, Rubenfeld argues that the Government compels him to aid in

---

John G. Simon, Robert A. Solomon, Stanton Wheeler, and Stephen Wizner.

**2.** According to the Yale University Faculty Handbook, the faculty of each school within the University, including the law school, have the authority to set educational policies within their school. *See* Burt Decl. at Ex. A. Thus, when the faculty set, amended, and then suspended its Non–Discrimination Policy, it did so as the governing body of the law school. *See* Burt Decl. at ¶ 5. Therefore, the voting majority of faculty members that make up the plaintiff group are coextensive with the law school itself with regard to the issues in this case. The court will sometimes use the terms "Law School," and "YLS" interchangeably in this Ruling in referring to the plaintiffs.

**3.** On May 3, 2004, the court granted the Motion For Withdrawal of Counsel [Dkt. No. 39] allowing the attorneys for the other plaintiff faculty members to withdraw from representing Professor Rubenfeld. He now appears *pro se.*

**4.** Several student groups have filed a related civil suit alleging that the Solomon Amendment also violates their constitutional rights. *See Student Members of SAME v. Rumsfeld,* No. Civ. A. 3:03–cv–1867 (JCH).

the dissemination of the Government's speech. Rubenfeld argues that compelling him to help disseminate another's speech is a violation of his First Amendment rights.

DoD opposes the summary judgment motion. It argues first that Yale University, not the Faculty, is the proper party to bring these claims. DoD also claims that, absent final agency action by the proper decision-maker at DoD, the Faculty's claims are not ripe for judicial review. If the suit is not to be dismissed on standing or ripeness grounds, DoD then argues that YLS is in violation of the Solomon Amendment because YLS has a practice which effectively prevents the military from participating in the YLS' official recruiting programs. Finally, DoD claims that the Solomon Amendment is a constitutional assertion of Congress's spending power and violates no constitutional rights.

In January 2004, DoD moved to dismiss YLS' claims for lack of standing and ripeness under FED. R. CIV. P. 12(b)(1) and its constitutional claims for failure to state a claim upon which relief could be granted under FED. R. CIV. P. 12(b)(6). On June 9, 2004, the court denied DoD's Rule 12(b)(1) motion. *Burt v. Rumsfeld,* 322 F.Supp.2d 189 (D.Conn.2004). The court held that the Faculty had suffered a constitutionally cognizable injury-in-fact when they, as the governing body of YLS, were forced to suspend its non-discrimination policy under the threat of government withdrawal of hundreds of millions of dollars of funding for sister schools within Yale University, and that the injury implicated legally protected First and Fifth Amendment rights. Additionally, the court held that the plaintiffs' claims were primarily legal in nature, that the threatened loss of fund-

ing constituted concrete and potentially catastrophic harm, and that the years of communications between the parties fleshed out the issue sufficiently for effective judicial review. Refusing to interpret "ripeness" as requiring that YLS live under a perpetual sword of Damocles, the court found the plaintiffs' claims ripe for review.[5] However, the court reserved decision on DoD's Rule 12(b)(6) motion and will address that aspect of DoD's Motion to Dismiss in this Ruling.

The Faculty has now moved for summary judgment on all of their claims, arguing that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. Professor Rubenfeld joins in that Motion on the claims pressed by him.

DoD counters that, to the extent the court does not dismiss the plaintiffs' constitutional claims under DoD's previous Rule 12(b)(6) motion for failure to state a claim, the court cannot grant summary judgment in favor of the plaintiffs because there are material facts in dispute. Specifically, it asserts a claim pursuant to Federal Rule 56(f) that it will become able to create material issues of fact upon the completion of its requested discovery.

## II. STANDARD OF REVIEW

### A. Rule 56(a) Summary Judgment Standard

The burden is on a party moving for summary judgment to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91

---

**5.** The court notes that at oral argument in December 2004, Government's counsel stated that DoD had yet to make a "final" determination, despite the passage of more than three years since the issue first arose and of nearly a year since Yale University provided the last requested information to DoD.

L.Ed.2d 202 (1986); *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir.2000). When a motion for summary judgment is supported by documentary evidence and sworn affidavits, the nonmoving party must present significant probative evidence to create a genuine issue of material fact. *See Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. 2505. A court must grant summary judgment " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact ....' " *Miner v. City of Glens Falls*, 999 F.2d 655, 661 (2d Cir.1993) (citation omitted). A dispute regarding a material fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich*, 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir.1992). A party may not create a genuine issue of material fact by presenting contradictory or unsupported statements, *see Securities & Exchange Comm'n v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978), nor may he rest on the "mere allegations or denials" contained in his pleadings, *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995); *see also Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir.1993) (holding that a party may not rely on conclusory statements or an argument that the affidavits in support of the motion for summary judgment are not credible). Further, a party may not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986).

The Local Rules of this court also address the obligation of the parties with regard to a motion for summary judgment: "All material facts set forth in said Local Rule 56(a) statement will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party in accordance with Local Rule 56(a)2." Local Rule 56(a)(1)(D.Conn.)

## B. DoD's Discovery Requests Pursuant to Rule 56(f)

DoD has asserted repeatedly in its opposition pleadings and at oral argument that DoD requires extensive discovery in order to oppose plaintiffs' summary judgment motion. DoD requested discovery in the footnotes of its summary judgment opposition brief and in the "Disputed Issues of Material Fact" section of its Local Rule 56(a)(2) filing, in place of the required list of material facts in dispute. *See* Def's Local Rule 56(a)(2) Statement at 7–9 [Dkt. No. 42] ("Def's Local Rule 56"). DoD also requested discovery in an additional, twenty-three page filing requested by the court in an attempt to bring specificity to DoD's previous requests. *See* Supplemental Declaration of Alan S. Modlinger [Dkt. No. 66] ("Supp. Modlinger Decl."). However, the court finds that discovery is not warranted.

■ This court is conscious of the principle that the grant of summary judgment prior to discovery is not to be undertaken lightly. *See, e.g., Hellstrom v. U.S. Dept. of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir.2000) (district court may grant summary judgment without discovery "[o]nly in the rarest of cases"); *Trebor*

*Sportswear Co., Inc. v. The Limited Stores, Inc.,* 865 F.2d 506, 511 (2d Cir. 1989); *Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 303–04 (2d Cir.2003). However, when a party "fails to produce any specific facts whatsoever to support [their case], a district court may, in its discretion, refuse to permit discovery and grant summary judgment." *Contemporary Mission, Inc. v. United States Postal Service,* 648 F.2d 97, 107 (2d Cir.1981) (dismissing plaintiff's conspiracy allegation without discovery). "An opposing party's mere hopes that further evidence may develop prior to trial is an insufficient basis upon which to justify the denial of [a summary judgment motion]." *Id.* at 107 (quotation omitted). The object of discovery is not to find out *if* a party has a claim or defense, but to develop a factual basis for its claim or defense. *See Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d Cir.1994).

 Also insufficient to justify a denial of summary judgment under Rule 56(f) are "bare assertion[s] that the evidence supporting a [party's] allegation is in the hands of the [other party]." *Contemporary Mission,* 648 F.2d at 107 (quotation omitted); *see also Paddington Partners,* 34 F.3d at 1138. A party cannot rely upon Rule 56(f) "where the result of a continuance to obtain further information would be wholly speculative." *Contemporary Mission,* 648 F.2d at 107. A court may properly deny a discovery request pursuant to Rule 56(f) "if it deems the request to be based on speculation as to what

potentially could be discovered." *Paddington Partners,* 34 F.3d at 1138. (emphasis added).

 The Second Circuit has developed a four-part test for district courts to use when ruling on a party's request for discovery under Rule 56(f). *Sage Realty Corp. v. Ins. Co. of North America,* 34 F.3d 124, 128 (2d Cir.1994).

> Rule 56(f) requires the opponent of a motion for summary judgment who seeks discovery to file an affidavit explaining: (1) the information sought and how it is to be obtained; (2) how a genuine issue of material fact will be raised by that information; (3) what efforts the affiant has made to obtain the information; and (4) why those efforts were unsuccessful.

*Id.; see also Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 926 (2d Cir.1985). "Additionally, the discovery sought must be material to the opposition of the summary judgment motion." *Sage Realty,* 34 F.3d at 128.

DoD's initial attempts at requesting discovery, found in its opposition to the plaintiffs' summary judgment motion and its Local Rule 56(a)(2) statement, assert no facts at all. *See, e.g.,* Def's Local Rule 56 at 7–9. DoD merely points out the plaintiffs' factual allegations and requests a broad range of discovery to determine to what extent these allegations are true. *See, e.g.,* Def's Local Rule 56(a)(2) Statement at Ex. A, ¶¶ 10–14 ("Modlinger Decl."); *see also* Mem. Opp. Summ. J. at 21 n. 7.[6]

---

**6.** For example, paragraph 12 of the Modlinger Declaration reads:

> With respect to the message that plaintiffs intend to send, defendant would require discovery from the plaintiff faculty members to establish whether, among the forty-five individual faculty members in this lawsuit, there is, in fact, any particularized message underlying the treatment of military recruiters at Yale Law School, and if

so, what that message is. Plaintiffs here have submitted declarations from only three of the forty-five members who claim injury to their First Amendment rights and whose intent is therefore relevant to this lawsuit. Defendant would require discovery (including depositions) concerning the intended message from a broader sample of the plaintiff group, especially given that in the context of this litigation it has become

During a teleconference on November 29, 2004, the court asked DoD to file another discovery document in an attempt to allow DoD to address more specifically how the requested information was to be obtained and the relationship between its requests and any material facts.

When combined, DoD's Local Rule 56(a)(2) Statement and the Supplemental Modlinger Declaration fail to pass the four-part discovery test laid out by the Second Circuit in *Sage Realty* and are insufficient to warrant discovery under Rule 56(f). First, DoD's Rule 56(f) Statement and discovery requests fail to explain what *specific* information is sought. Instead, the government either 1) reiterates factual assertions made by the plaintiffs, *see, e.g.*, Modlinger Decl. at ¶ 10, and requests discovery apparently aimed at seeing to what extent these claims are true, or 2) lists broad topic areas the government wishes to explore, many of which are not material facts, *see, e.g.*, Supp. Modlinger Decl. at ¶ 5(g)(v).[7] The court finds these requests to be "based on speculation as to what *potentially could be* discovered." *Paddington Partners*, 34 F.3d at 1138 (emphasis added). As the Second Circuit has noted, "[w]hile Rule 56(f) discovery is specifically designed to enable a [party] to fill material evidentiary gaps in its case ... it does not permit a [party] to engage in a 'fishing expedition'." *Id.* (citation and quotation omitted). DoD apparently seeks to embark on just such an expedition.

Secondly, DoD never alleges *any* material facts that its discovery is likely to support. Again, it relies on the vague concept that it requires discovery to negate the material facts supported by competent evidence submitted by the plaintiffs. Even with regard to these vague requests, DoD does not demonstrate "how a genuine issue of material fact will be raised" by the proposed discovery. *See Sage Realty*, 34 F.3d at 128.

For example, in both its original Local Rule 56(a)(2) Statement and in its supplemental statement, DoD requests information related to the issue of coercion in-

---

clear that the faculty members are hardly united; one faculty member has withdrawn from the principal plaintiff group because he disagrees with its positions in this litigation, *see* Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment (filed by Plaintiff Jed Rubenfeld) at 1, and another faculty member has now sought to join the litigation several months after the complaint was filed, *see* Stipulation and Order of April 8, 2004. To the extent that plaintiffs have purported to submit to the Court documentary evidence concerning the faculty's intent with respect to its treatment of military recruiters, *see* Declaration of Robert A. Burt, Ex. I, defendant would seek to investigate the factual background concerning that document. Specifically, defendant would seek discovery (including document requests and depositions) from Yale University, Yale Law School, and its faculty, concerning meetings and discussions among faculty members and administrators at Yale Law School and Yale University with respect to the intent underlying decisions regarding military recruiters' access to the facilities and services of CDO.

7. Paragraph 5(g)(v) reads:

Defendant anticipates that it will take deposition of the following (via subpoena where necessary): ...[w]itnesses from Yale Corporation, Yale University, or Yale Law School who will be able to testify, pursuant to FED.R.CIV.P. 30(b)(6), concerning the following subjects: ... the manner in which policies are established and enforced at Yale Law School (including policies concerning non-discrimination and recruitment by legal employers), including the roles of Yale University (including trustees, officers, and administrators); Yale Law School (including trustees, officers, and administrators); the Career Development Office at Yale Law School; the faculty members at Yale Law School; students at Yale Law School; and student organizations at Yale Law School in establishing and enforcing such policies.

volved in the plaintiffs' First Amendment claims. Specifically, DoD requests information concerning whether or not YLS was coerced by DoD's threats into suspending its Non–Discrimination Policy ("NDP") and allowing military recruiters to use YLS' Career Development Office ("CDO"). *See, e.g.,* Supp. Modlinger Decl. at ¶ 5(g)(iv) (requesting deposition testimony regarding "the non-discrimination policy at Yale Law School, including its ... suspension ..., [and] the intent underlying its ... suspension ...."); *see also* Modlinger Decl. at ¶ 10 (requesting "appropriate discovery with respect to plaintiffs' freedom of speech allegations" that "DOD has forced plaintiffs to send a 'very different message'" by "requiring that military recruiters be allowed access to CDO programs"). However, when pressed at oral argument on the need for discovery concerning coercion, counsel for DoD conceded the fact that the YLS involuntarily suspended its NDP because of DoD's threat to cut off funding to Yale University.[8] Tr. at 124.

DoD does not satisfy the first and second prongs of *Sage Realty* when it seeks discovery unrelated to material facts or requests a fishing expedition in the speculative hope that the facts put forth by the plaintiffs might be shown to be untrue.

With respect to prongs three and four of the *Sage Realty* test, it is important to note that while discovery was not stayed by order of the court, the court does not find DoD unreasonably failed to make efforts to obtain discovery. The court's posture regarding discovery could reasonably have been interpreted as a *de facto* stay. However, that does not now justify unwarranted discovery or excuse DoD's failure to come forward with evidence within its own control.

Much of what DoD requests through discovery concerns information reasonably within its own control. For example, DoD asks to depose no fewer than 23 witnesses concerning such topics as what facilities, services, and accommodations YLS made available to military recruiters, *see* Supp. Modlinger Decl. at ¶ 5(g)(*l*); how military recruiters were treated differently than non-military recruiters, *see id.* at ¶ 5(g)(iii); and what contracts the federal government gave to Yale, and how that money was used, *see id.* at ¶ 5(g)(viii). Presumably military personnel who recruited at YLS know what they were and were not allowed to do, where they were and were not al-

---

8. Specifically, on at least six occasions at oral argument, the court asked defense counsel what possible information he could expect to elicit through deposition testimony that would put the material fact of coercion at issue. The court repeatedly gave counsel leeway to engage in pure speculation. Defense counsel could not respond with even a single speculative assertion prior to conceding the fact. Tr. at 108–11, 118–20, and 122.

The colloquy ended as follows:
THE COURT: So the answer to my question is you have not identified any discovery you need on the question of whether there's a forced speech here. Is that fair to say, sir?
MR. MODLINGER (ATTORNEY FOR DEFENDANT): Let me look at my—

THE COURT: That calls for a yes or no answer to my question.
MR. MODLINGER: Your Honor, we indicated that we required discovery that doesn't fit with relationship to the narrow tailoring point.
THE COURT: Sir, that isn't my question. My question is, is the discovery on the sole fact of whether there is force applied here by governmental action causing the plaintiff to act in the way it doesn't want to act with respect to its First Amendment rights. I'm not on the other elements.
MR. MODLINGER: I did not understand that before. I apologize. With respect to that claim, I believe I'm not aware of any discovery that we would need with respect to that particular claim.
Tr. at 123–24.

lowed to go, and what services, if any, YLS provided for them. Further, military recruiters know how they were treated when they visited YLS, and know if that treatment differed from what was afforded to other recruiters.[9] Finally, the United States Government, the provider of grants to universities across the nation, knows how much money it provides to Yale University and what programs are funded with that money. Surely, DoD can obtain this information from the other agencies and departments of the federal government, of which it is a part.

DoD also failed to come forward with knowledge within its control when it denied the Faculty's Statement of Material Facts. For example, DoD stated that it "lacked sufficient knowledge or information to admit or deny" whether a student hired by the military as an intern in 2003 initiated contact with the military, or whether military recruiters contacted the student. Def's Local Rule 56 at 6, ¶ 49. An employer has access to information concerning how it hired an employee. As a member of the Armed Forces, the recruiter works for DoD, and it is within DoD's control to ask the recruiter who hired the employee for this information.

DoD also claimed that it "lacked sufficient knowledge or information to admit or deny" whether, prior to 2002, military recruiters were: denied access to the CDO because they would not sign the NDP, see id. at 3, ¶ 18 and 5, ¶ 38; permitted to appear on the CDO website without signing the NDP, see id. at 3, ¶ 22; or permitted to meet with students or student groups on campus at the invitation of students or student groups, regardless of

whether the military recruiters had signed the NDP, see id. at 4, ¶ 27. Additionally, DoD claimed it lacked sufficient knowledge to admit or deny whether, beginning in 2002, military recruiters were permitted to participate in the Fall Interview Program ("FIP") and Spring Interview Program ("SIP") because the NDP had been suspended. See id. at 6, ¶ 45. This is all information that military recruiters would have to have, based on their personal experiences with YLS. Even a de facto stay of discovery does not excuse a party from coming forward, in response to a motion for summary judgment, with information within its control.

DoD has thus failed to satisfy the Sage Realty test. DoD's request for discovery pursuant to Rule 56(f) is therefore denied.

The Government's refusal to come forward with information within its control or its denial of facts without supporting evidence has consequences under this District's Local Rule 56. The court will treat as fact for the purposes of this motion for summary judgment the following: 1) any Local Rule 56(a)(1) fact that is admitted or conceded by the defendant; and 2) any Local Rule 56(a)(1) fact offered by the plaintiffs that DoD failed to rebut or claimed insufficient knowledge of, despite information being within its control.[10]

## III. BACKGROUND

### A. Yale Law School's Non–Discrimination Policy

Yale Law School enacted a non-discrimination policy in 1972. That policy barred discrimination on the basis of religion, race, sex, and national origin. See Plain-

---

9. The court does not mean to suggest DoD might not obtain, through discovery of YLS, further evidence on this subject. However, it is indisputable that DoD has evidence on these subjects which it could have brought forth in response to the plaintiffs' summary judgment motion and did not.

10. When the court refers to a fact that falls into the second category, it will mark it with a parenthetical: "(deem. adm'd)"

tiffs' Local Rule 56(a)(1) Statement of Material Facts at ¶ 7 ("Pls' Local Rule 56"); Defendant's Local Rule 56(a)(2) at ¶ 7 (deem. adm'd). Since 1978, YLS has also prohibited discrimination on the basis of sexual orientation. *See* Pls' Local Rule 56 at ¶ 8; Def's Local Rule 56 at ¶ 8 (deem. adm'd). YLS' NDP, which applies to all aspects of YLS life, provides that YLS is committed to opposing:

> discrimination on the grounds of age; color; handicap or disability; ethnic or national origin; race; religion; religious creed; gender (including discrimination taking the form of sexual harassment); marital, parental or veteran status; sexual orientation; or the prejudice of clients.

*See* Pls' Local Rule 56 at ¶ 9; Def's Local Rule 56 at ¶ 9. Prior to the suspension of the NDP in 2002, employers who refused to certify their compliance with it were barred from school-sponsored recruiting services offered through the CDO. *See* Pls' Local Rule 56 at ¶ 17; Def's Local Rule 56 at ¶ 17 (deem. adm'd).

The CDO is located on-campus. *See* Bryant Decl. at Ex. A.[11] Prospective employers seeking to participate in YLS' official recruiting program must register with the CDO. *See id.* at ¶ 6. Once registered, employers send pertinent information to the CDO, and CDO employees communicate that information to YLS students via the Law School website. *See* Pls' Local Rule 56 at ¶¶ 21–22; Def's Local Rule 56 at ¶¶ 21–22 (deem. adm'd). Law students review these communications, sign up for interviews with employers of their choice, and submit resumes online. *See* Pls' Local Rule 56 at ¶ 23; Def's Local Rule 56 at ¶ 23 (deem. adm'd). Registered employers can also post job listings online through the CDO and download student resumes from the CDO database. *See* Pls' Local Rule 56 at ¶ 24; Def's Local Rule 56 at ¶ 24 (deem. adm'd). (DoD admits that employers can download student resumes).[12] DoD claims that in the last few years, between 79 to 100% of YLS students used the CDO for job searches. *See* Def's Amendment Mem. at 4.

## B. The Solomon Amendment

According to DoD, "[s]ince the Vietnam War ... Congress has confronted 'disaffection' with regard to the military among some students and faculty at institutions of higher learning that impairs the ability of the military to recruit." Mem. Opp. Summ. J. at 3. In response, the Congress has passed numerous pieces of legislation over the years "[t]o encourage educational institutions to open their campuses to military recruiters" by prohibiting the "distribution of certain federal funds to institutions of higher learning that barred military recruiters from their campuses." *Id.* In 1995, in light of policies like the YLS NDP, and controversies over the presence of ROTC programs on university campuses, Congress enacted the Solomon Amendment, now codified at 10 U.S.C. § 983. Among other things, the Solomon Amendment denies certain categories of federal funding to institutions of higher education that prevent military recruitment on campus. 10 U.S.C. § 983(b). On October 28, 2004, Congress amended the Solomon Amendment. *See* Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, Pub.L. No. 108–375, § 552, 118 Stat. 1811 ("NDAA") (2004). The Amendment currently provides as follows:

---

11. DoD agrees that the CDO is located on-campus. *See* Def's Mem. Further Opp. Summ. J. at 5 n. 6 [Dkt. No. 63] ("Def's Amendment Mem.").

12. DoD appears to adopt without dispute all of these CDO-related facts. *See* Def's Amendment Mem. at 3.

(b) Denial of funds for preventing military recruiting on campus.—No funds described in subsection (d)(1) may be provided by contract or by grant to an institution of higher education (including any subelement of such institution) if the Secretary of Defense determines that that institution (or any subelement of that institution) has a policy or practice (regardless of when implemented) that either prohibits, or in effect prevents—

(1) the Secretary of a military department or Secretary of Homeland Security from gaining access to campuses, or access to students (who are 17 years of age or older) on campuses, for purposes of military recruiting in a manner that is at least equal in quality and scope to the access to campuses and to students that is provided to any other employer; or

(2) access by military recruiters for purposes of military recruiting to the following information pertaining to students (who are 17 years of age or older) enrolled at that institution (or any subelement of that institution):

(A) Names, addresses, and telephone listings.

(B) Date and place of birth, levels of education, academic majors, degrees received, and the most recent educational institution enrolled in by the student.

10 U.S.C. § 983(b).

DoD's original interpretive regulations limited loss of funding to the particular part of the university ("subelement") found not to be in compliance. *See* 61 Fed.Reg. 7739, 7740 (Feb. 29, 1996). In other words, if a subelement of a university, like a law school, denied access to military recruiters, then only that subelement would lose funding, not the entire institution. Further,

the Amendment initially implicated only Defense Department funding. *See* Mem. Opp. Summ. J. at 4. Law schools, unlike other subelements of a university, are not typically recipients of large amounts of federal funding.

In 1997, Congress extended the rule denying federal funds to apply to grants and contracts provided by the Departments of Labor, Health and Human Services, Education, and Transportation, as well as Defense. Pub.L. No. 104–208, 110 Stat. 3009 (1996), codified at 10 U.S.C. § 983(d)(1). This extension threatened certain types of student aid, including Perkins Loans and work study funds.[13] However, the applicable regulations continued to cabin the consequences of a subelement's failure to grant access to military recruiters to that subelement itself, such that non-compliance did not affect the university as a whole. *See id.*

In 1999, Congress also modified the statute's language to extend its applicability to any "institution of higher education (including any subelement of such institution)." 10 U.S.C. § 983(c)(2), as modified by Pub.L. No. 106–65, § 549(a)(1) (1999). Following this change, DoD adopted interim regulations, effective immediately, that defined an "institution of higher education" to include "all sub-elements of such an institution." Defense Federal Acquisition Regulation Supplement: Institutions of Higher Education, 65 Fed.Reg. 2056 (Jan. 13, 2000). The effect of this redefinition was that a violation in any part of the university would put federal funding for the entire university in jeopardy. 48 C.F.R. § 252.209–7005.

---

**13.** In the fall of 1999, Congress enacted further revisions to the Solomon Amendment protecting students of non-compliant university subelements. Funds "available solely for student financial assistance or related admin-istrative costs" are now exempt from the Solomon Amendment. Department of Defense Appropriations Act of 2000, Pub.L. No. 106–79, 113 Stat. 1212 (1999).

A 2004 amendment to the Solomon Amendment recently added, *inter alia*, the phrase "in a manner that is at least equal in quality and scope to the access to campuses and to students that is provided to any other employer" to the end of subsection (b)(1), a phrase that had previously existed only as a safe harbor provision in the regulations. *See, e.g.*, 32 C.F.R. § 216.4(c)(3). This provision makes equal treatment of military recruiters an affirmative duty, instead of a safe harbor, for educational institutions. DoD argued that the 2004 amendment required the plaintiffs to amend their complaint and required the court to allow DoD to file a motion to dismiss this second amended complaint.[14] However, there is no good reason to do so, and DoD offers none. The court requested and received additional briefing on the ramifications of the 2004 amendment. *See* Dkt. Nos. 63–65. Although the 2004 amendment undercuts some of the plaintiffs' statutory arguments,[15] the court finds that the issues remain essentially the same. *See, e.g., Forum for Academic & Institutional Rights v. Rumsfeld*, 390 F.3d 219, 230 n. 10 (3d Cir.2004) ("FAIR").[16] The issues have been fully briefed. The court will proceed to decide the pending motions.

## C. Military Recruiting at YLS and the Suspension of the NDP

In light of Congress's policy concerning homosexual conduct in the Armed Forces, popularly known as the "Don't Ask, Don't Tell" policy, DoD has refused to certify its compliance with the Law School's NDP. As a result, under the NDP, DoD has been denied use of the CDO since 1978. Mem. Opp. Summ. J. at 6–7; *see also* Safriet Decl. at ¶ 6. Instead, the Law School has offered military recruiters open access to classrooms and other meeting spaces on campus for informational sessions and other recruiting activities, including interviews, at the invitation of a student organization; and open access to any student or student group to reserve a classroom or other meeting space for such a meeting at any time. *See* Pls' Local Rule 56 at ¶ 27; Def's Local Rule 56 at ¶ 27 (deem. adm'd); *see also* Safriet Decl. at ¶¶ 7–9. Additionally, the Law School makes contact information available to DoD, including students' names, hometowns and states, academic majors, and degrees received. *See* Pls' Local Rule 56 at ¶ 28; Def's Local Rule 56 at ¶ 28.

The current conflict between YLS and DoD began in 2001 when a DoD official fired the opening salvo of a several-year-

**14.** DoD asserted the right to file a new motion to dismiss based on the 2004 amendment during a teleconference on November 29, 2004.

**15.** The plaintiffs have not taken the position that the 2004 amendment in any way inhibits the court's ability to decide the pending motions.

**16.** As the Third Circuit pointed out in *FAIR*, the court does not return to square one simply because a statute as amended disadvantages one of the parties in the same fundamental way as before. *See* 390 F.3d at 230 n. 10 (quoting *Northeastern Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662, 113 S.Ct.

2297, 124 L.Ed.2d 586 (1993)) (holding that several of FAIR's challenges to the Solomon Amendment were not mooted by the 2004 amendment merely because it disadvantaged the appellant in the same fundamental way). The basic issue has not changed, and the parties have had the opportunity to submit supplemental briefs on the 2004 Amendment. The 2004 Amendment alters the statute to add language previously found in the regulations, bringing it into line with DoD's original arguments. From the start, DoD has argued that YLS has an affirmative duty to provide access to military recruiters at least equal in quality and scope to that provided to non-military recruiters prior to the 2004 Amendment. *See* Supp. Mem. Opp. Summ. J. at 5.

long series of written exchanges between Yale and various DoD officials regarding the NDP. On December 17, 2001, Colonel Clyde J. Tate, III, U.S. Army, advised Yale University President Richard Levin that, "I understand that military recruiting personnel have been inappropriately limited in their ability to recruit or have been refused student recruiting information at Yale University by a policy or practice of the Yale Law School." Robinson Decl. at Ex. A. Colonel Tate advised Levin that "current statutes deny the use of certain federal funds" to institutions of higher education with a policy or practice of denying military recruiting personnel entry to campuses, and stated that, "[t]his letter provides you an opportunity to clarify your institution's policy regarding military recruiting on the campus of Yale University as well as Yale Law School." *Id.* Finally, Colonel Tate advised that, "based on this information, Department of Defense officials will make a determination as to your institution's eligibility to receive funds by grant or contract." *Id.*

A series of letters and meetings ensued, with military officials repeatedly categorizing the YLS NDP as not in compliance with the Solomon Amendment. On May 29, 2002, Colonel Tate informed President Levin, "Unless we receive new information from you by July 1, 2002, showing that policies and practices of your institution have been modified to conform with federal requirements ... we will consider forwarding this matter to the Office of the Secretary of Defense with a recommendation of funding denial." Robinson Decl. at Ex. C; *see also* Pls' Local Rule 56 at ¶ 40; Def's Local Rule 56 at ¶ 40. To avoid this $300 million funding loss to Yale University, the YLS faculty voted in 2002 to approve a "temporary" suspension of the NDP.[17] *See* Pls' Local Rule 56 at ¶¶ 42–43; Def's Local Rule 56 at ¶¶ 42–43 (deem. adm'd); *see also* Burt Decl. at 21 and at Ex. I; Robinson Decl. at Ex. D.

Following the Faculty's suspension of the NDP requirement, YLS permitted military recruiters to use the CDO and participate in the Law School's formal recruiting programs, the Fall Interview Program ("FIP") and Spring Interview Program ("SIP"). *See* Pls' Local Rule 56 at ¶ 45; Def's Local Rule 56 at ¶ 45. The military gained access to the CDO website. *See* Pls' Local Rule 56 at ¶ 46; Def's Local Rule 56 at ¶ 46. During the 2002 FIP, one YLS student interviewed with a military recruiter. *See* Pls' Local Rule 56 at ¶ 47; Def's Local Rule 56 at ¶ 47. During the 2003 SIP, no students interviewed with a military recruiter. *See* Pls' Local Rule 56 at ¶ 48; Def's Local Rule 56 at ¶ 48. One student did secure a summer 2003 internship with the Army, though not through the FIP or SIP. *See* Pls' Local Rule 56 at ¶ 49; Def's Local Rule 56 at ¶ 49. During the FIP and SIP for 2003–2004, a total of five Law School students interviewed with military recruiters. *See* Pls' Local Rule 56 at ¶¶ 51–52; Def's Local Rule 56 at ¶¶ 51–52. To date, none has accepted employment with the military. *See id.*

Conflict between YLS and the military continued, however. In early 2003, the Army referred the controversy to the Department of Defense. On May 29, 2003, the Office of the Under Secretary of Defense issued a letter signed by William J. Carr, Acting Deputy Undersecretary for Military Personnel Policy, opining that YLS and, by implication, Yale University, are in violation of the Solomon Amendment. *See* Pls' Local Rule 56 at ¶ 50 (set forth in the Robinson Decl. at Ex. K (here-

---

17. By the 2003 recruiting season, it appears that every law school that is part of a university receiving federal funding had suspended their non-discrimination policy as applied to military recruiters in order to avoid losing that federal funding. *FAIR*, 390 F.3d at 228.

inafter referred to as the "Carr Letter")); Def's Local Rule 56 at ¶ 50. In this letter, Acting Deputy Undersecretary Carr specifically declared that the Law School, through its recruiting policy requiring that military recruiters sign the NDP or be excluded from the CDO, "sends the message that employment in the Armed Forces of the United States is less honorable or desirable than employment with the other organizations that [YLS] permits to participate in its CDO programs." *Id.*

After setting forth the applicable law and regulations and DoD's interpretation, the Carr Letter explained that YLS was not complying with DoD regulations and was "in effect" preventing military recruiting on campus. *Id.* Carr further informed Yale that the NDP, despite its temporary suspension, "remains an obstacle to military recruiters and their ability to plan for, schedule, and gain access to Yale Law School students for the purpose of military recruiting." *Id.* As such, Carr concluded, "Yale's policy is in violation of federal law," and advised Levin, "it is my duty under law to recommend to the Principal Deputy Under Secretary of Defense for Personnel and Readiness that Yale University be determined ineligible for Department of Defense funding." *Id.* Carr gave notice that he would so recommend on June 29, 2003, "unless you advise me before that date of a change in policy sufficient to overcome the deficiencies outlined above." *Id.*

On October 16, 2003, forty-five YLS faculty members, constituting a voting majority of the YLS faculty, *see* Pls' Local Rule 56(a)(1) at ¶ 2; Def's Local Rule 56(a)(2) at ¶ 2 (deem. adm'd), filed the instant suit.

On December 23, 2003, the decisionmaker for the Department of Defense for purposes of enforcement of the Solomon Amendment, Principal Deputy Under Secretary of Defense for Personnel and Readiness Charles S. Abell, *see* Am. Supp. Mem. Opp. Summ. J. at 1 [Dkt. No. 54],

wrote to President Levin stating that, despite more than two years of correspondence, meetings, and negotiations, he still did not have enough information to make his decision. *See* Robinson Decl. at Ex. N. Principal Deputy Under Secretary Abell requested detailed answers to a series of questions to allow him to "assess [Yale's] proposal properly." *Id.* President Levin responded in detail by letter on January 16, 2004. *See id.* at Ex. O.

At oral argument on December 9, 2004, the Government reported that Principal Deputy Under Secretary Abell had not yet made his decision concerning Yale's compliance with the Solomon Amendment.

## IV. DISCUSSION

### A. Parties' Claims

The claims brought by the Faculty and those brought by Professor Rubenfeld are not coextensive. Both the Faculty and Professor Rubenfeld assert that YLS is in compliance with the Solomon Amendment, as amended. They argue that because the FIP and SIP occur off-campus, YLS' refusal to permit military recruiters access to CDO-run programs does not constitute denying military recruiters "access to campus" or "access to students on campus." Furthermore, the Faculty and Rubenfeld argue that, because the military is subject to the same YLS policy requiring employers to subscribe to the NDP in order to participate in the CDO recruiting program as every other employer, YLS is offering access to military recruiters that is "equal in quality and scope" to that granted to non-military recruiters because the military is welcome to sign the NDP and access the CDO.

Even if YLS does violate the Solomon Amendment, the Faculty then argue that the Solomon Amendment places an unconstitutional condition on hundreds of millions of dollars of federal funding given to

Yale University. The Faculty argue that, because enforcement of the Solomon Amendment will cut off federal funding not reasonably related to military recruiting, it penalizes them for exercising their First Amendment rights. Such a penalty constitutes an unconstitutional condition on receipt of federal funds.

The Faculty claim the Solomon Amendment violates their First Amendment rights in two ways. First, the Faculty argue that, because the Solomon Amendment has compelled them to suspend the NDP and include military recruiters in the CDO recruiting process, they are being prevented from sending their chosen message— that discrimination will not be tolerated— and forced to convey a very different message— that discrimination will be tolerated in certain circumstances. Additionally, the Faculty claim that the Solomon Amendment violates their First Amendment right to freedom of association by interfering with their right to disassociate from an entity, the United States military, whose explicit policies conflict with the institutional beliefs of YLS, as expressed in the NDP.

The Faculty also claim that the Solomon Amendment violates their substantive due process right to educational autonomy under the Fifth Amendment. They describe this right as the right "to banish discriminatory conduct from all of the Law School's activities in order to protect their students and to create the environment necessary to carry out the Faculty Members' educational mission." Faculty Mem. Supp. Summ. J. at 29 [Dkt. No. 35] ("Mem. Supp.Summ. J."). The Faculty argue that the caselaw recognizes "a faculty's autonomous governance of the [university's] educational environment," as a right implicit in the concept of ordered liberty. *Id.* at 30.

Professor Rubenfeld does not press a substantive due process claim and does not press freedom of association as a basis for his First Amendment claim. His compelled speech claim is slightly different from that of the Faculty. Professor Rubenfeld argues that DoD is violating the Faculty's First Amendment rights not by forcing the Faculty to send a message the Faculty does not want to send, but rather by compelling them to help disseminate DoD's recruiting message, a message with which Professor Rubenfeld and the rest of the Faculty disagree.

DoD opposes all of the plaintiffs' claims. It continues to argue that Yale University, and not YLS, is the proper party to bring suit and that, therefore, the plaintiffs lack standing to maintain this action.[18] Additionally, DoD again claims that because, after three years, it still has not made a "final" decision concerning Yale's status, the claims are not ripe. The court has already addressed DoD's standing and ripeness defenses, *see Burt*, 322 F.Supp.2d at 196–203, and it will not revisit those issues: it adheres to its prior decision.[19]

To the extent the plaintiffs' claims are justiciable, DoD next argues that YLS is in violation of the Solomon Amendment because the NDP acts as a barrier, keeping military recruiters from receiving access to YLS students equal in quality and scope to that given to other recruiters. DoD further argues that the Solomon Amendment does not impose an unconstitutional condition that violates the plaintiffs' First and

---

**18.** The court notes that the Solomon Amendment treats universities and their sub-elements as the same. *See* 10 U.S.C. § 983(b).

**19.** Indeed, the passage of nearly eight more months without a "final" decision causes this court to consider whether DoD ever intends to reach that decision. Having obtained its objective by threatening to cut-off funds, there may be no reason for it to reach a final, and in its view only then justiciable, decision.

Fifth Amendment rights, but is simply an exercise of Congress's power under the Spending Clause. *See* U.S. CONST. art. 1, § 8, cl. 1.

## B. YLS NDP Does Not Comply With the Solomon Amendment

■ The Faculty contend that YLS is in compliance with the terms of the Solomon Amendment, even in the Amendment's most-recently-amended form. In their Supplemental Memorandum concerning the effect of the October 2004 amendment on YLS' statutory compliance, the Faculty contend that the access granted to military recruiters is "equal in quality and scope" to that granted to non-military recruiters. *See* Mem. Further Supp. Summ. J. at 3 [Dkt. No. 64] ("Pls' Amendment Mem."). The Faculty argue that, because the military is merely subject to the same YLS policy as every other employer, YLS is offering "equal access." *See* Pls' Amendment Mem. at 3. First the Faculty contend that, "military recruiters are granted 'equal' access when nondiscrimination policies are equally applied to military and civilian employers." [20] *Id.* (citing *Gay and Lesbian Law Students Ass'n v. Bd. of Trs.*, 236 Conn. 453, 673 A.2d 484 (1996) and *Lloyd v. Grella*, 83 N.Y.2d 537, 611 N.Y.S.2d 799, 634 N.E.2d 171 (1994)). They further contend that the NDP does not "prohibit, or in effect prevent" the military from gaining access to YLS students, because the system in place prior to the NDP's suspension, *i.e.*, the *status quo ante*, provided the military with pertinent student information; access to students via

letter, phone, and email; the ability to book rooms at the off-campus recruiting venue; and the ability to meet with students on campus by invitation of any student. *See id.* at 4.

Additionally, Professor Rubenfeld asserts that at no time has YLS instituted a policy or practice that restricts " 'military recruiters' 'access to campuses' or 'access to students on campus." ' Rubenfeld Mem. Further Supp. Summ. J. at 2 [Dkt. No. 65] ("Rubenfeld Amendment Mem."). Recruiting interviews arranged through the CDO are held off campus at a local hotel, and therefore, according to Rubenfeld, YLS' refusal to permit military recruiters to participate in CDO programs without signing the NDP cannot violate the Solomon Amendment. *See* Rubenfeld Amendment Mem. at 2.

In response, DoD argues that the October 2004 amendment clarifies that YLS must grant military recruiters access to the CDO recruiting programs, or else its policy in effect prevents military recruiters from gaining access to students that is equal in quality and scope to that granted to other recruiters. *See* Def's Amendment Mem. at 4. DoD further argues that the "equal opportunity" to subscribe to the NDP does not meet the Solomon Amendment's requirement for equal "access." *See id.* Congress meant actual, substantive access, and military recruiters' inability to sign the NDP " 'in effect' prevents" them from gaining equal access to students.[21] *Id.* at 4–5. Finally, DoD argues

20. YLS points out that in the 1990s, when the Christian Legal Society failed to subscribe to the NDP, it was not permitted to use CDO services. *See* Pls' Amendment Mem. at 3.

21. The court questioned at oral argument why DoD could not sign the NDP since its "Don't Ask, Don't Tell" policy concerns conduct, *see Able v. United States*, 155 F.3d 628, 635 (2d Cir.1998) (distinguishing *Romer v.*

*Evans*, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) and *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), as involving status-based restrictions, instead of the conduct restrictions reviewed in *Able* ), not "sexual orientation." DoD demurred to this suggestion, and neither plaintiffs nor the defendant press any argument on this basis.

that Congress's repeated reference to "campuses" is merely meant to specify students who are enrolled at a given institution, not place a geographic boundary on the access afforded to military recruiters.

The court finds that YLS is not in compliance with the Solomon Amendment, as amended, when it conditions recruiting on subscription to the NDP. In addressing this claim, the court's analysis is controlled by the plain meaning of the statute. *See United States v. Awadallah*, 349 F.3d 42, 51 (2d Cir.2003); *see also United States v. Proyect*, 989 F.2d 84, 87 (2d Cir.1993) ("[W]hen the language of the statute is clear, its plain meaning ordinarily controls its construction."). The Solomon Amendment plainly states that funding may be denied if an institution has a policy that "prohibits, or in effect prevents ... [military recruiters] from gaining access to campuses, or access to students ... on campuses ... in a manner that is at least equal in quality and scope to the access to campuses and to students that is provided to any other employer ...." 10 U.S.C. § 983(b). It is undisputed that military recruiters are not allowed access to the CDO if they do not sign the NDP. Non-military recruiters that sign the NDP have access to the CDO. YLS' policy of requiring subscription to the NDP as a condition of participation in CDO recruiting programs clearly "in effect" prevents military recruiters from accessing students through the CDO.

The argument that the military has the opportunity to sign the NDP is unavailing. The statute does not say that military recruiters must have the same opportunity to comply with an institution's policies as non-military employers, nor does it say that military recruiters must have access to the same procedures as non-military employers in order to gain access to students. Congress could have easily drafted the Amendment to say either, but it did

not. In arguing that YLS has not "prohibited" or "prevented" access as proscribed by the Solomon Amendment, *see* Pls' Reply Mem. in Further Supp. Summ. J. at 3–4 [Dkt. No. 52], the Faculty ignore other language in the Solomon Amendment that requires access to students to be "in a manner that is at least equal in quality and scope" to that given to other recruiters. *See FAIR*, 390 F.3d at 228 (after September 11, 2001, DoD began a policy of requiring not only access to campuses, but "treatment equal" to other recruiters). The statute clearly states that an institution's policies cannot prohibit or prevent military recruiters from accessing campuses and students in a manner at least equal to other recruiters. In effect, the NDP does just that.

The fact that recruiting interviews take place off-campus does not eliminate the Solomon Amendment violation. The CDO is located on-campus. Prospective employers seeking to participate in YLS' official recruiting program must register with the CDO. Once registered, employers send pertinent information to the CDO, and CDO employees communicate that information to YLS students, via the Law School website. Law students review these communications, sign up for interviews with employers of their choice, and submit resumes, all online through the CDO. Registered employers can also post job listings online through the CDO and download student resumes from the CDO database. In order to participate in YLS' official recruiting program, an employer must have access to the CDO and its computers, and these are part of the YLS campus. To prevent military recruiters from accessing the CDO and its programs is to deny military recruiters access to a part of Yale's campus.

In sum, YLS may offer military recruiters the same opportunity as non-military

recruiters to comply with its policy regarding subscription to the NDP, but that policy "in effect prevents" military recruiters from gaining access to campus and students on campus "at least equal in quality and scope" to that afforded other recruiters. Therefore, under the plain meaning of the Solomon Amendment, YLS is not in compliance with the Solomon Amendment. The plaintiffs' motion for summary judgment on its statutory claim is therefore denied.

It is the view of this court that both sides have had "a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried" on the plaintiffs' statutory claim. *Ramsey v. Coughlin*, 94 F.3d 71, 73–74 (2d Cir. 1996). Generally with regard to their motion for summary judgment, the Faculty have asserted that there are only five issues of fact material to its claims, and those are not seriously in dispute. *See* Mem. Supp. Summ. J. at 15. The plaintiffs have strenuously pressed that no material issue of fact is in dispute and that summary judgment is appropriate.

This court is convinced that all the evidence material to this claim is before the court (certainly that the plaintiffs would submit) and that awaiting a motion for summary judgment by DoD "would not alter the outcome." *Ramsey*, 94 F.3d at 74. Based on the analysis above of the statutory claim, the court concludes that DoD is entitled to summary judgment on the statutory claim as a matter of law based on the undisputed facts. Entry of summary judgment for the non-movant DoD is appropriate and expedient. *See Ramsey*, 94 F.3d at 74; *see also Hispanics for Fair & Equitable Reapportionment v. Griffin*, 958 F.2d 24, 25 (2d Cir.1992); *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir.1991).

## C. Solomon Amendment Is An Unconstitutional Condition

The Faculty and Professor Rubenfeld assert that the condition imposed on federal grants to Yale University by the Solomon Amendment is an unconstitutional condition. The essence of the plaintiffs' claim is that the Solomon Amendment as applied by DoD denies a benefit to Yale University on a basis that infringes their constitutionally protected rights.

For more than half a century, the Supreme Court has expressly recognized that, even though a person may not be entitled by right to a valuable benefit and "even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely." *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). While having no "right" to do so, *see id.*, Yale University receives $300 million from the federal government.

In *Perry*, the Supreme Court held that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests— especially, his interest in freedom of speech." *Id.* The basis for this conclusion is that otherwise the government could create indirectly "a result which [it] could not command directly." *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). "[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited .... Such interference with constitutional rights is impermissible." *Perry*, 408 U.S. at 597, 92 S.Ct. 2694.

DoD argues that the unconditional conditions doctrine is inapplicable because the Solomon Amendment is merely an ex-

ercise of Congress's power under the Spending Clause. *See* U.S. CONST. art. 1, § 8, cl. 1. The Spending Clause does permit conditions to be imposed that are reasonably related to the purpose of the federal program. *See So. Dakota v. Dole,* 483 U.S. 203, 213, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987)(O'Connor, J., dissenting); *see also Rust v. Sullivan,* 500 U.S. 173, 196, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). Here, DoD makes no claim, nor could it the court believes, that the condition imposed by the Solomon Amendment is in any way related, let alone reasonably, to the purposes for which the federal funds have been given to Yale. The condition here is imposed on the recipient, not on "a particular program." *Rust,* 500 U.S. at 197, 111 S.Ct. 1759. Under these circumstances the Spending Clause power cannot excuse a violation of the unconstitutional conditions doctrine as addressed in *Perry* and its progeny.

The Supreme Court has held that an important question to be determined is whether "the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns into compulsion.'" *Dole,* 483 U.S. at 211, 107 S.Ct. 2793. Put another way, is the government, by imposing conditions on the receipt of funds by Yale University, coercing the plaintiffs. Here, that issue is not in dispute because DoD has conceded the fact of coercion. *See* Tr. at 124. There is no question of fact that the Faculty, acting as Yale Law School, voted to suspend its NDP because of the threatened cut-off of $300 million to other parts of Yale University. This court concludes, as a matter of law, that this conceded coercion is well past the point of pressure and is compulsion.

There remains only the issue of whether the plaintiffs' constitutional rights have been violated. *See Perry,* 408 U.S. at 597, 92 S.Ct. 2694. That issue is hotly contested by the parties. Therefore, the court must determine whether the coerced NDP suspension caused by the Solomon Amendment has resulted in an unconstitutional violation of the plaintiffs' rights.

### 1. First Amendment/Compelled Speech Claim

*a. Introduction.* The plaintiffs make two related, but distinct, arguments that DoD is compelling them to speak against their will in violation of their rights under the First Amendment. The Faculty argue that, in being compelled to suspend the NDP and include military recruiters in the CDO recruiting process, they are being prevented from sending their chosen message— that discrimination will not be tolerated— and forced to convey a very different message— that discrimination will be tolerated in certain circumstances. *See* Mem. Supp. Summ. J. at 18–19. Professor Rubenfeld presses a slightly different argument: even if the Faculty Members are not being forced to send any message themselves, DoD is violating the plaintiffs' First Amendment rights by compelling them to *help* disseminate *DoD's* recruiting message, a message with which Professor Rubenfeld and the Faculty disagree.

DoD replies that it is not materially impeding First Amendment expression. DoD contends that YLS' message is getting through to its intended audience loud and clear, and that, at most, plaintiffs' complaint is that suspension of the NDP makes them appear hypocritical. This, DoD asserts, is not a cognizable First Amendment claim.

In addition, DoD argues that YLS is not being forced to convey implicit approval of discrimination by allowing military recruiters into the CDO. YLS allows hundreds of recruiters to participate in the CDO program and DoD contends that YLS cannot

be perceived as endorsing all the views of each of these potential employers. DoD claims that observers cannot possibly understand YLS to be endorsing the military's discriminatory policies in light of the school's 27–year history of preaching non-discrimination based on sexual orientation. Additionally, DoD argues that the presence of military recruiters at CDO events only twice a year does not force the Faculty Members to "declare a belief," *West Virginia State Bd. Educ. v. Barnette,* 319 U.S. 624, 631, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), or invade their "freedom of mind," *Wooley v. Maynard,* 430 U.S. 705, 714, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977).

Finally, DoD argues that to the extent that YLS is being compelled to do anything, it is being compelled to aid military recruiters in the *act* of recruiting, not in speech. Thus, DoD argues, the constitutionality of the Solomon Amendment should be examined in light of the Supreme Court's test for the regulation of expressive conduct formulated in *United States v. O'Brien. See* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (holding that a statute forbidding an individual to destroy his draft card did not violate the individual's First Amendment rights).

 **b.** *Free Speech Right.* As Justice Jackson stated in *Barnette,* "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." 319 U.S. at 642, 63 S.Ct. 1178. "A system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts." *Wooley,* 430 U.S. at 714, 97 S.Ct. 1428. In other words, the First Amendment guarantees both "the right to speak freely and the right to refrain from speaking at all." *Id.;*

*see also Pac. Gas & Elec. v. Pub. Util. Comm'n of California,* 475 U.S. 1, 11, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (Powell, J., plurality opinion); *Int'l Dairy Foods Ass'n v. Amestoy,* 92 F.3d 67, 71 (2d Cir.1996). These two complementary concepts serve as "components of the broader concept of individual freedom of the mind." *Wooley,* 430 U.S. at 714, 97 S.Ct. 1428 (quotation omitted).

 Where the government compels no actual speech from an individual, but "only" compels him to aid a third party in disseminating that third party's speech, a First Amendment violation occurs. *See Pacific Gas,* 475 U.S. at 15, 106 S.Ct. 903 (Powell, J., plurality opinion) (stating that a California utility regulation requiring a utility company to include a third-party's newsletter in its billing envelopes constituted unconstitutional compelled speech); *United States v. United Foods, Inc.,* 533 U.S. 405, 413, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001) (holding that a mandatory assessment imposed on mushroom producers to support advertising promoting general mushroom sales violated the producer's First Amendment right against compelled speech). That the governmental action does not restrict an objecting party from communicating its own message does not render that action constitutional. *See United Foods,* 533 U.S. at 411, 121 S.Ct. 2334. Nor is a violation of the freedom not to speak, or not to aid others in disseminating their speech, cured by the speaker's ability to efficiently or effectively disclaim or controvert the speech it has been forced to disseminate. *See, e.g., Miami Herald Publ'g Co. v. Tornillo,* 418 U.S. 241, 257–58, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) (a newspaper cannot be forced to print replies to its editorials, despite its clear ability to print a response); *see also Pacific Gas,* 475 U.S. at 16–18, 106 S.Ct. 903 (Powell, J., plurality opinion) (utility

company cannot be forced to include the newsletter of a third party in its envelopes, despite ability to respond). The First Amendment grants a speaker "the autonomy to choose the content of his own message." *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston,* 515 U.S. 557, 573, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995).

In *Wooley v. Maynard,* the State of New Hampshire passed a statute requiring every non-commercial vehicle to have a license plate bearing the state motto "Live Free or Die." 430 U.S. at 707, 97 S.Ct. 1428. The plaintiffs in *Wooley* were Jehovah's Witnesses whose religious beliefs conflicted with the state's motto, and who were repeatedly charged with violating New Hampshire's statute by covering up the motto on their automobile. *See id.* at 707–08, 97 S.Ct. 1428. The Supreme Court held that the state could not "constitutionally require an individual to participate in the dissemination of an ideological message by displaying it on his private property in a manner and for the express purpose that it be observed and read by the public." *Id.* at 713, 97 S.Ct. 1428. Even though display of the motto was "a more passive act" than the forced act of saluting the flag found in *Barnette,* "the difference is essentially one of degree." *Wooley,* 430 U.S. at 715, 97 S.Ct. 1428.

In *Miami Herald,* the State of Florida had passed a "right of reply" statute that required any newspaper that assailed the personal character or official record of a candidate for public office to print any reply the candidate might have, free of charge. *See* 418 U.S. at 244, 94 S.Ct. 2831. The *Miami Herald* printed several editorials critical of a candidate for a seat in the Florida House of Representatives and refused to publish the candidate's replies, in violation of the statute. *See id.* at 243–44, 94 S.Ct. 2831. The candidate argued that the statute was constitutional because it

did not "prevent[ ] the *Miami Herald* from saying anything it wished." *Id.* at 256, 94 S.Ct. 2831. The Supreme Court disagreed, holding that "[e]ven if a newspaper would face no additional costs to comply with a compulsory access law and would not be forced to forgo publication of news or opinion by the inclusion of a reply, the Florida statute fails to clear the barriers of the First Amendment because of its intrusion into the function of editors." *Id.* at 258, 94 S.Ct. 2831. The Court reached this conclusion despite the fact that the newspaper had already expressed its views in the original editorials, and it could do so again in future editorials in response to the candidate's replies.

Likewise, in *Pacific Gas,* the Supreme Court said that the state could not force a corporation to "assist in disseminating [a third party's] message" by including the third party's newsletter in empty space found in the corporation's billing envelopes. 475 U.S. at 15, 106 S.Ct. 903 (Powell, J., plurality opinion). The Public Utilities Commission of California decided that the excess space in utility companies' billing envelopes belonged to the People of California, and it ordered the companies to include the newsletter of a third party association in those envelopes in order to provide "a variety of views" on utility issues to ratepayers. *See id.* at 5–6, 106 S.Ct. 903 (Powell, J., plurality opinion). Pacific Gas appealed the Commission's ruling, arguing that it had a First Amendment right "not to help spread a message with which it disagrees . . . ." *Id.* at 7, 106 S.Ct. 903 (Powell, J., plurality opinion). The Supreme Court agreed, stating that not only was it unconstitutional for the Commission to force the utility to use its private property to disseminate a third party's message, but such compulsion could also force the utility to speak in response to the third party's message, an additional unconstitutional result. *See id.*

at 15–16, 106 S.Ct. 903 (Powell, J., plurality opinion) ("[this] kind of forced response is antithetical to the free discussion that the First Amendment seeks to foster"). Thus, not only did the ability of the utility company to respond easily fail to cure the constitutional violation: it actually created the potential for a further violation.

■■ **c. Violation of Freedom of Speech.** The Solomon Amendment violates the plaintiffs' First Amendment right to freedom of speech. First, they have been coerced into assisting DoD in sending its message. DoD's message that the Faculty Members do not wish to aid in disseminating is that it is acceptable for an organization to exclude homosexuals, or at a minimum those who admittedly engage in homosexual conduct, from employment. This message is the essence of the military's "Don't Ask, Don't Tell" policy. *See* 10 U.S.C. § 654(b). The right of the Faculty and Professor Rubenfeld to refrain from aiding another in the latter's speech has been violated by the Solomon Amendment requirement that the CDO include DoD's recruiting message. *Pacific Gas,* 475 U.S. at 15, 106 S.Ct. 903 (Powell, J., plurality opinion). Second, the Faculty's right to express their message without modification by DoD is also being violated. The Solomon Amendment has forced the Faculty to change their message from a categorical statement that "employers who discriminate based on sexual orientation are not welcome at YLS-sponsored recruiting events" to an equivocal statement that includes the disclaimer "except for the military." [22] Forced alteration of the Faculty's message violates their First Amendment right to freedom of speech. *See id.* at 16, 106 S.Ct. 903 (governmental coercion that causes alteration of one's message is violative of the First Amendment).

It is quite clear from the cases discussed that DoD's argument, that no violation has occurred because the Faculty are free to disclaim, and indeed have disclaimed, DoD's position, is unavailing in this case. [23] The fact that the YLS' message of its suspended NDP "gets through" DoD's "Don't Ask, Don't Tell" policy does not insulate DoD from the violation of the plaintiffs' First Amendment rights. *See Miami Herald,* 418 U.S. at 257–58, 94 S.Ct. 2831. Even if it could be said that allowing DoD to participate in the CDO recruiting program could never be viewed as an endorsement by YLS of DoD's policy, under the cases discussed above the First Amendment has still been violated. [24]

DoD claims that the military does not come to campus primarily to "advocate a message of discrimination against gays and lesbians" and may not even discuss its "Don't Ask, Don't Tell" policy during re-

---

**22.** That the Faculty's message is altered by the enforcement of the Solomon Amendment is tellingly revealed by the language used by Colonel Carr: "Moreover, by singling out military recruiters, [YLS] sends the message that employment in the Armed Forces of the United States is less honorable or desirable than employment with the other organizations that [YLS] permits to participate in its CDO programs." Carr Letter at 3. Successful enforcement of the Solomon Amendment alters that message.

**23.** Thus, no need for discovery arises concerning the plaintiffs' ability to respond. *See, e.g.,* Def's Local Rule 56 at 8, ¶ 8.

**24.** DoD's argument that no one would understand YLS to endorse the military's policy because YLS does not endorse all the views of the 250 employers who participate in the CDO program lacks merit. YLS does endorse the view expressed by every recruiters' endorsement of YLS' NDP. *See FAIR,* 390 F.3d at 237 (even if the law schools' sole disagreement with military recruiters is over signing the NDP policy, this is enough for a First Amendment violation).

cruiting. Tr. at 68–69. This claim is immaterial. The Supreme Court in *Pacific Gas* said that, despite not knowing exactly what the third party would say once it was given the bully pulpit at the utility company's expense, the government could not compel an organization "to associate with speech with which [it] *may* disagree." 475 U.S. at 15, 106 S.Ct. 903 (Powell, J., plurality opinion) (emphasis added). Here, it is clear that DoD's message of its "Don't Ask, Don't Tell" policy stands in direct contravention of the YLS NDP. The underlying "Don't Ask, Don't Tell" policy, and the military's express rejection of the NDP, serve as sufficient "speech messages" for the purpose of the court's First Amendment analysis. "Were the government freely able to compel . . . speakers to propound political messages with which they disagree, this protection would be empty, for the government could require speakers to affirm in one breath that which they deny in the next." *Id.* at 16, 106 S.Ct. 903.

DoD seeks to avoid plaintiffs' claim of a freedom of speech violation by arguing that recruiting is not speech, but merely conduct designed to perform the function of filling employment vacancies, and that any speech that occurs is incidental to this conduct. *See, e.g., O'Brien,* 391 U.S. at 376–77, 88 S.Ct. 1673. Therefore, according to DoD, recruiting should be equated with the act of burning one's draft card, *id.,* and not to speech such as the words "Live Free or Die" on a license place, *see, e.g., Wooley,* 430 U.S. at 713, 97 S.Ct. 1428. The consequence of treating recruiting as conduct, and not speech, is that the court would examine the Solomon Amendment using the lower, intermediate scrutiny standard. *Compare O'Brien,* 391 U.S. at 377, 88 S.Ct. 1673 (propounding the intermediate scrutiny test for communicative conduct), *with Pacific Gas,* 475 U.S. at 19, 106 S.Ct. 903 (Powell, J., plurality opinion)

(examining compelled speech using strict scrutiny).

It should first be noted that the NDP is unquestionably speech and that the Solomon Amendment infringes on the Faculty's right to speak, or utter, the NDP. Further, DoD's argument ignores the vast amount of communication inherent in recruiting. *See FAIR,* 390 F.3d at 236–37. Recruiting involves more than an employer alerting potential employees to a vacancy, and potential employees responding to the alert, although this is a speech message in itself. At its essence, recruiting is a bilateral discussion of the objective and subjective positives and negatives of an employer and potential employee that will lead each party to make a decision concerning whether or not to voluntarily associate with the other. The Third Circuit put the employer's goal succinctly: "to convince prospective employees that [the] employer is worth working for." *Id.* at 237. As such, "recruiting necessarily involves 'communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes'—the hallmarks of First Amendment expression." *Id.* (quoting *Village of Schaumburg v. Citizens for a Better Env't,* 444 U.S. 620, 632, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980)). Clearly, DoD seeks such communication because it presses its right to participate in the CDO's FIP and SIP, in which students sign up for personal interviews, and strenuously argues that all the other access to students, student information, and the YLS campus is inadequate. The Solomon Amendment exists, therefore, to require YLS to permit DoD speech in recruiting.

 **d. Strict Scrutiny.** Having found that YLS, acting through the Faculty, has been unconstitutionally coerced into foregoing its own message and into assisting DoD in the dissemination of DoD's

message of its "Don't Ask, Don't Tell" policy, the court's analysis does not end there. Because not all burdens on constitutional rights are constitutional violations, the court must next address whether the government's action can withstand scrutiny.

DoD argues that the Solomon Amendment should be examined under the intermediate scrutiny test promulgated by *O'Brien* for communicative conduct. While the issue of where precisely one draws the line between conduct and speech for these purposes is not always an easy one, it does not present particular difficulty in this case. The NDP is clearly a speech message.[25] And as already discussed, the recruiting coerced by the Solomon Amendment involves speech and communication of a viewpoint. Thus, the court rejects DoD's argument that the intermediate scrutiny test applies. *See id.* at 236–37 (oral and written communication used for recruiting purposes is speech); *see also Wooley*, 430 U.S. at 715, 97 S.Ct. 1428 (New Hampshire motto "Live Free or Die" on license plate sufficient "ideological message" to invoke First Amendment protection); *Boy Scouts of America v. Dale*, 530 U.S. 640, 651–52, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000) (promulgated regulations such as Scout Law, the Boy Scout Oath, and organization position statements sufficient evidence of protected First Amendment expression).

■ A governmental regulation that burdens a private individual or organization's First Amendment rights by compelling that individual or organization to speak or assist in disseminating another's speech is subject to strict scrutiny. *See Pacific Gas*, 475 U.S. at 19, 106 S.Ct. 903 (Powell, J., plurality opinion) (regulation could be found valid "if it were a narrowly tailored means of serving a compelling state interest."); *see also FAIR*, 390 F.3d at 242 (citing *Riley v. Nat'l Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 798, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) (regulation impairing speakers' First Amendment rights under the compelled speech doctrine could not survive "exacting First Amendment scrutiny")). While strict scrutiny is an exacting standard, the Supreme Court has clearly rejected the proposition that "strict scrutiny is 'strict in theory, but fatal in fact.'" *Landell v. Sorrell*, 382 F.3d 91, 112 (2d Cir.2004) (quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995)). Under the strict scrutiny test, DoD bears two burdens: 1) proving the existence of a compelling state interest and 2) showing that the restriction is narrowly tailored to advance that interest. *Id.* at 110.

The first of the Government's burdens, a compelling interest, is not at issue here. The plaintiffs do not contest that Congress's interest in raising and maintaining an effective military is a compelling government interest.[26] Tr. at 11. However, the presence of a broad compelling interest does not necessarily mean that the Congress has chosen a narrowly tailored avenue to address that interest. Because the court finds that the Solomon Amendment is not narrowly tailored, it need not

---

**25.** The court imagines one might argue that promulgating a policy like the NDP is an action or conduct, but if that is so, it is no less protected expression than the act of publishing a newspaper. *See Miami Herald*, 418 U.S. at 256, 94 S.Ct. 2831 (state cannot compel editors to publish specific matter).

**26.** The Faculty did suggest at oral argument that, while the government has a compelling interest to raise and maintain a military, it does not have a compelling interest in doing so by forcing its way into the CDO recruiting process. *See* Tr. at 11–12. The court views this as a narrow tailoring argument that it will address, *infra*.

decide whether Congress's interest in raising an effective military is compelling in this setting. The court will assume this interest is compelling, as it believes it is. The court will, therefore, proceed to address DoD's other burden under the *Landell* test, whether the speech restriction is narrowly tailored.

In *Landell,* the Second Circuit wrote "to explain the nature of the narrow tailoring inquiry required" in the First Amendment setting. 382 F.3d at 125. It explained that "[t]he narrow tailoring inquiry examines the 'fit' between means and ends." *Id.* In addition to showing that the Solomon Amendment significantly advances Congress's interest in raising and maintaining a military, "[i]n order to satisfy the 'narrow tailoring' standard, the [DoD] must also prove that the mechanism chosen is the *least restrictive means* of advancing that interest." *Id.* at 126 (emphasis in original) (citing *United States v. Playboy Entm't Group, Inc.,* 529 U.S. 803, 816, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000)). This is to say, " '[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative.' " *Id.* at 126 (quoting *Playboy Entm't Group,* 529 U.S. at 813, 120 S.Ct. 1878). Therefore, the court must address the extent to which Congress's interest is advanced by the Solomon Amendment and whether the government has created an issue of fact with regards to its burden of proving the absence of less restrictive alternatives, which alternatives would be as effective in advancing its compelling interests while impinging less on First Amendment rights. *See id.*

In *Landell,* the State of Vermont defended, *inter alia,* mandatory campaign spending limits enacted in an attempt to reform its campaign finance laws and battle political corruption. *See id.* at 96. Vermont had argued that it " 'had already explored less restrictive alternatives and

found them to be ineffective." ' *Id.* at 132. It cited its previous failed attempt to impose voluntary spending limits through legislation. *Id.*

The Second Circuit found this to be insufficient evidence of narrow tailoring. In remanding the case to the district court for reconsideration of the narrow tailoring issue, the Second Circuit requested findings of fact relating to several questions: "(1) what alternatives were considered by the legislature, including both alternative *types* of regulations and alternative *amounts* for the limits; (2) why these alternatives were rejected; (3) whether and how these alternatives would impinge less on First Amendment rights; and (4) whether the alternatives would be as effective as the mandatory spending limits in advancing the [government's] interests." *Id.* at 136 (emphasis in original).

Here, DoD has offered no proof that the Solomon Amendment is the least restrictive means by which the Congress can successfully raise and maintain an effective military. DoD claims that it has confronted "disaffection" on college campuses that "impairs the ability of the military to recruit," a problem that is "compounded" by periodic military spending cuts. Mem. Opp. Summ. J. at 3. While it claims that "Congress has taken a *variety* of steps over the years to remedy the problem," it lists only several iterations of the same step. *Id.* at 3 (emphasis added). DoD lists attempts by Congress, beginning in 1968 and continuing through the present day, to penalize institutions of higher learning who it believes are "barring" military recruiters from their campuses by denying them various forms of federal funding. *See id.* at 3–4. The Solomon Amendment is merely the most recent, and most reaching, of these attempts. *See id.* at 4–5.

The absence of any evidence of Congressional attempts at alternative types of regulation, information concerning which has been available to DoD since the beginning of this litigation, weighs heavily against its narrow tailoring claim. As the Third Circuit noted,

> Unlike the typical employer, the military has ample resources to recruit through alternative means. For example, it may generate student interest by means of loan repayment programs. And it may use sophisticated recruitment devices that are generally too expensive for use by civilian recruiters, such as television and radio advertisements. These methods do not require the assistance of law school space or personnel. And while they may be more costly, the Government has given us no reason to suspect that they are less effective than on-campus recruiting.

*FAIR*, 390 F.3d at 234–35. Therefore, the Third Circuit found that the Solomon Amendment was not narrowly tailored, and thus unconstitutional under strict scrutiny analysis. *See id.* at 242. In this case, DoD has failed to produce any evidence to support a finding that the Solomon Amendment is narrowly tailored to substantially advance a compelling governmental interest.

In addition, DoD offers no evidence to support a finding that the Solomon Amendment, and the suspension of the NDP for the past two years at YLS that it caused, has advanced its goal of raising an army through effective recruiting. DoD merely asserts that the CDO program "provides an easy and efficient means of assisting students in finding jobs," a means the military must have access to in order to compete successfully for students.[27] Mem. Opp. Summ. J. at 29–30. Despite the fact that any information on military recruiting successes and failures is uniquely within the control of the military, DoD has offered no evidence that either 1) the number of recruits it obtained prior to the suspension of the NDP was insufficient, or 2) that implementation of the Solomon Amendment, in the form of the suspension of the NDP, has increased, or is even likely to increase, the number of those recruits. In fact, the only reference made to any success or failure of recruiting in this litigation is the military's admission that, in the more than two years the NDP has been suspended, it has obtained only one recruit and that this recruit did not come to the military via the CDO program. *See* Def's Local Rule 56 at ¶ 49. While it is mathematically possible for military recruiting at Yale to have been worse prior to suspension of the NDP, DoD has offered no evidence that such was the case. This is plainly insufficient to carry the government's burden of creating at least a material issue of fact concerning how enforcement of the Solomon Amendment is narrowly tailored to advance the interests of Congress in raising an army.[28]

Therefore, the Solomon Amendment cannot withstand strict scrutiny and is unconstitutional as applied to YLS. The motion for summary judgment of the Faculty and Professor Rubenfeld on the First

---

27. It bears noting that approximately 50% of Yale law school students obtain employment as judicial law clerks, a recruiting process that does not use the CDO program or any form of on-campus recruiting. *See* Bryant Decl. at ¶ 5. This would appear to undercut DoD's assertion that access to the CDO program is necessary to law student recruiting.

28. DoD has not come forward, as required under Local Rule 56(a), with evidence to create even an issue of fact that Congress considered alternative legislation, that the Solomon Amendment in fact materially advanced Congress's goals, or that other, less restrictive, alternatives would not be as effective as the Solomon Amendment. These facts are all within DoD's control.

Amendment compelled speech claim is granted.

## 2. Faculty's First Amendment/Association Claim

The Faculty also assert that their First Amendment right to freedom of association is infringed by the Solomon Amendment. For more than four decades, the Supreme Court has recognized that individuals have a First Amendment freedom to associate in order to advance shared beliefs. *See Green Party of New York State v. New York State Bd. of Elections,* 389 F.3d 411, 418–19 (2d Cir.2004) (citing *NAACP v. Alabama,* 357 U.S. 449, 460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)). Among the most highly protected forms of association is that undertaken to express opinions on public issues. *See NAACP v. Claiborne,* 458 U.S. 886, 913, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). Such First Amendment expression " 'is more than self-expression; it is the essence of self-government.' " *Id.* (quoting *Garrison v. Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)). Supreme Court case law reflects "a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide-open.' " *Id.* (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

The Faculty assert that its NDP is an expression of their views on employment discrimination based on, *inter alia,* sexual orientation. Both discrimination and sexual orientation are public issues today. By requiring potential employers to subscribe to the NDP prior to becoming part of the YLS recruiting program, the Faculty argue that they are using their freedom to associate, or disassociate, both to inculcate their values in their students and to propagate publicly their beliefs regarding discrimination. The Faculty claim that the Solomon Amendment impermissibly interferes with their First Amendment right to disassociate from an entity, the United States military, whose explicit policies conflict with YLS' institutional beliefs, as expressed in the NDP. The Faculty claim that they "intended to convey [their] disapproval of the military's discrimination against gays and lesbians by denying military recruiters the services of the CDO." Mem. Supp. Summ. J. at 22. The Faculty argue that this refusal constitutes a decision not to permit the military to officially associate itself with YLS recruiting programs. According to YLS:

> it is not the mere presence of military recruiters at the Law School that distorts the Faculty Members' message and damages the protective educational environment they have sought to create. It is the military's commandeering of Law School resources in carrying out its discriminatory recruitment practices under the Law School's auspices that the Nondiscrimination Policy forbids.

Mem. Supp. Summ. J. at 23–24. The Faculty rely on cases such as *Claiborne, Hurley,* and *Dale* for the proposition that the First Amendment guarantees a private institution's right not to associate itself with an entity whose explicit policies conflict with the private party's institutional values.

DoD argues that should the court analyze the case at bar on associational grounds, *Hurley* and *Dale* do not provide support for the Faculty's position. DoD distinguishes *Hurley* by noting that it involved marching in a parade, "a quintessential form of expressive activity," and that the participation of the gay and lesbian group that attempted to march would result in that group's message being attributed to the parade organizers. Mem. Opp. Summ. J. at 17. DoD claims that YLS' long tradition of opposing discrimination, the sophistication of the average law

school student, and statements made by several YLS students evidencing their understanding that YLS is being forced to choose between the NDP and federal funding, provide evidence that the chance of such misattribution "is vanishingly small." Mem. Opp. Summ. J. at 18. The unlikelihood of misattribution and YLS' ability to publicize their disagreement, DoD argues, bars any associational claim.

In this regard, DoD also seeks to distinguish *Dale* on several grounds. First, it argues that the Solomon Amendment does not force YLS to accept military recruiters as members of their organization, but merely as temporary visitors to their campus. Second, the military recruiters would not be speaking "for" YLS, as an assistant scout master would for the Boy Scouts. Third, DoD argues that while one of the Boy Scouts' main goals was to instill values in young people, a goal threatened by the presence of a leader who espoused values the Scouts opposed, recruiting is essentially an economic activity, and military recruiters do not seek to instill any values in the students they interview. Thus, military recruiting does not "[strike] at the heart of [YLS'] goals," Mem. Opp. Summ. J. at 20, and the Faculty's associational rights are not violated. The court disagrees and finds that there is substantial support for the Faculty Members' association claim.

In *Dale*, the Boy Scouts appealed a New Jersey Supreme Court decision that held that the state's public accommodations law denied the Boy Scouts the ability to revoke an assistant scout master's membership in the organization upon learning that he was gay. 530 U.S. at 644, 120 S.Ct. 2446. The Boy Scouts argued that "homosexual conduct is inconsistent with the values it seeks to instill," and that by forcing it to include an open and avowed homosexual, the New Jersey public accommodations law violated

its First Amendment right of expressive association. *Id.*

In order to determine the Boy Scouts' claim, the Supreme Court formulated a three-part test. As concisely summarized by the Third Circuit recently, these elements are: "(1) whether the group is an "expressive association;" (2) whether the [governmental] action at issue significantly affects the group's ability to advocate its viewpoint; and (3) whether the [government's] interest justifies the burden it imposes on the group's expressive association." *FAIR*, 390 F.3d at 231; *see also Dale*, 530 U.S. at 648–58, 120 S.Ct. 2446.

**a. *Expressive Association.*** In concluding that the New Jersey law violated the Boy Scouts' First Amendment rights, the *Dale* Court noted that "the First Amendment's protection of expressive association is not reserved for advocacy groups." 530 U.S. at 648, 120 S.Ct. 2446. "Associations do not have to associate for the 'purpose' of disseminating a certain message in order to be entitled to the protections of the First Amendment. An association must merely engage in expressive activity that *could* be impaired in order to be entitled to protection." *Id.* at 655, 120 S.Ct. 2446 (emphasis added). However, "to come within [the First Amendment's] ambit, a group must engage in some form of expression, whether it be public or private." *Id.* at 648, 120 S.Ct. 2446. The Court found that, through its written mission statement, the Scouts directly expressed the values it supports and attempts to instill in its members. *Id.* at 649, 120 S.Ct. 2446. The Court further held that "[i]t seems indisputable that an association that seeks to transmit such a system of values engages in expressive activity." *Id.* at 650, 120 S.Ct. 2446. Thus, the Court found the Boy Scouts to be an expressive association.

In examining the Boy Scouts' ability to advocate its viewpoint, the Court first noted that the Scout Oath and Law, on which the Scouts based their claim, does not explicitly mention sexual orientation. *See id.* However, the Scouts interpreted the terms "morally straight" and "clean" as being at odds with homosexuality and homosexual conduct. *See id.* The Scouts asserted that "it 'teach[es] that homosexual conduct is not morally straight' . . . and that it does 'not want to promote homosexual conduct as a legitimate form of behavior.' " *Id.* at 651, 120 S.Ct. 2446. The *Dale* Court accepted that assertion, stating that it "need not inquire further to determine the nature of the Boy Scouts' expression with respect to homosexuality" and rejected the notion that it is the "role of the courts to reject a group's expressed values because they disagree with those values or find them internally inconsistent." *Id.*

Thus, YLS does not need to be an advocacy group to claim a right to freedom of association, but it must engage in some expression, publicly or privately, in order to be protected by the First Amendment. *See id.* at 648, 120 S.Ct. 2446. Like the Boy Scouts, YLS has asserted the values that it seeks to espouse outwardly and to inculcate within the law school. *See* Mem. Supp. Summ. J. at 22. Furthermore, YLS has promulgated a written policy statement outlining those values. *See id.* This written policy is the NDP, which clearly states that YLS is opposed to employment discrimination on the basis of, *inter alia,* sexual orientation. *See* Slifkin Decl. at Ex. E. YLS has gone further than the Boy Scouts and explicitly adopted a policy that announces *how* it expresses the NDP both to its students and to the outside world: by banning prospective employers from using CDO services if they do not subscribe to the NDP. YLS is clearly an expressive association for the purposes of First Amendment analysis.

**b.** *Affect Ability to Advocate.* Turning to the extent to which New Jersey's law interfered with the Scouts' expression, the *Dale* Court explicitly gave great deference to "an association's view of what would impair its expression." 530 U.S. at 653, 120 S.Ct. 2446. While the Court noted that an organization could not immunize itself from anti-discrimination laws simply by asserting inclusion of a disfavored individual would impair its message, it gave great weight to the fact that Dale was openly gay and a leader in the gay community in concluding that "Dale's presence in the Boy Scouts would, at the very least, force the organization to send a message, both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior." *Id.* In fact, Dale's openly gay status and the Boy Scouts' assertions that his presence would impair their message appear to be the only two things the Court considered in finding substantial interference. *See id.* at 651–56, 120 S.Ct. 2446.

DoD's argument—that *Dale* is distinguishable because military recruiters do not become a part of the faculty and do not officially speak for YLS while they are on campus— does not bear up. First, *Hurley* makes clear that mere participation in an event sponsored by an expressive association is sufficient to invoke that association's First Amendment protections. *See, e.g.,* 515 U.S. at 572–73, 115 S.Ct. 2338 (noting that "every participating unit affects the message conveyed by [a] private organizer"). Secondly, the *Dale* Court held that the Boy Scouts could expel Dale, not merely remove him from his leadership position in the Scouts. *See, e.g., Dale,* 530 U.S. at 645, 120 S.Ct. 2446. It was Dale's "presence," *id.* at 653, 120 S.Ct. 2446, not his position as an official spokesman for the Scouts, that "would, at the very least, force the organization to send a message . . . that the Boy Scouts accepts homosexu-

al conduct as a legitimate form of behavior," *id.*

The key to *Dale*'s analysis of the second factor is the substantial deference given to a private organization's determination of 1) what its message is and 2) what significantly interferes with its ability to advocate its chosen message. As the Supreme Court pointed out, once an organization asserts a message or value that it seeks to express, federal courts "need not inquire further to determine the nature of the [organization's] expression." *Id.* at 651, 120 S.Ct. 2446. Likewise, great deference is due to "an association's view of what would impair its expression." *Id.* at 653, 120 S.Ct. 2446. As the Third Circuit has pointed out, in *Dale* "the reason why there was 'no question' ... that a gay scoutmaster would undermine the Boy Scouts' message was because the Boy Scouts *said it would.*"[29] *FAIR*, 390 F.3d at 233 (citing *Dale*, 530 U.S. at 653, 120 S.Ct. 2446) (emphasis in original).

YLS makes two things clear. First, it clearly asserts that, through its NDP and its policy that employers cannot utilize the CDO without subscribing to the NDP, it seeks to express the idea that employment discrimination based on sexual orientation, even if done by the military, is wrong. *See* Mem. Supp. Summ. J. at 22. YLS also makes clear that it believes giving military recruiters access to the CDO, and therefore to officially-sanctioned-YLS-recruiting programs, substantially affects its ability to advocate its chosen message opposing employment discrimination, both to its students and to the public. *See* Mem. Supp. Summ. J. at 23–24.

The Supreme Court's analysis in *Dale* lends significant support to this argument. The majority in *Dale* made much of Dale's status as an openly homosexual male and a leader in the gay community. 530 U.S. at 653, 120 S.Ct. 2446. His inclusion in the Scouts forced them to "send a message ... that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior." *Id.* And as the Court in *Hurley* noted, requiring the parade organizers to include an unwanted group "requir[ed] petitioners to alter the expressive nature of their parade." 515 U.S. at 572–73, 115 S.Ct. 2338.

Here, the military is completely open about its policy of excluding individuals who engage in homosexual conduct from service in the armed forces. The statutory underpinnings of the "Don't Ask, Don't Tell" policy can be found in the United States Code. *See* 10 U.S.C. 654(b). Nothing could constitute a more open espousal of a given viewpoint than codification in the laws of our nation. Thus, as the inclusion of an open homosexual in an organization opposed to homosexuality obviously impaired the Boy Scouts' message in *Dale*, the inclusion of the military in YLS' recruiting program impairs its message: it forces it to "send a message ... that [YLS] accepts [employment discrimination based on sexual orientation] as a legitimate form of behavior." *See, e.g., Dale*, 530 U.S. at 653, 120 S.Ct. 2446. When viewed in conjunction with the high level of deference afforded to organizations by the Su-

---

**29.** While not a factor in its decision, the court notes that the deference the *Dale* Court accorded expressive associations would appear to be particularly appropriate in the university setting, in light of the Supreme Court's "tradition of giving a degree of deference ..." to universities because they "occupy a special niche in our constitutional tradition." *Grutter v. Bollinger*, 539 U.S. 306, 328–29, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003); *see also Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985); *Board of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 96 n. 6, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978); *Regents of the Univ. of California v. Bakke*, 438 U.S. 265, 319 n. 53, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.).

preme Court in *Dale* as to what an organization claims is its message and as to its claim that the Government's action will undermine YLS' message, it becomes obvious that the Solomon Amendment substantially interferes with the Faculty Members' ability to advocate their viewpoint. It "requires" YLS "to alter the expressive content" of its policy. *Hurley*, 515 U.S. at 572–73, 115 S.Ct. 2338.

c. ***Strict Scrutiny.*** Finally, the *Dale* Court undertook the balancing inquiry demanded by the third prong of its test by applying strict scrutiny. In explicitly rejecting the use of *O'Brien* intermediate scrutiny, the Court found that laws "directly and immediately affect[ing] associational rights" must be reviewed using "traditional First Amendment analysis . . . ." *Dale*, 530 U.S. at 659, 120 S.Ct. 2446. The *Dale* Court focused on the compelling interest prong of strict scrutiny. *See id.* Concluding that New Jersey's interest in preventing discrimination was not compelling enough to justify the burden on the Boy Scouts' associational rights, the Court held that New Jersey's attempt to apply its public accommodation law to the Scouts ran afoul of the First Amendment. *Id.*

As in *Dale*, strict scrutiny applies in the case at bar, and DoD must prove that it has a compelling interest that "justif[ies] such a severe intrusion on [an organization's] rights to freedom of expressive association." *Id.* "But '[i]t is not enough to show that the [DoD's] ends are compelling; the means must be carefully tailored to achieve those ends.'" *FAIR*, 390 F.3d at 234 (quoting *Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989)). *See also Rutan v. Republican Party of Illinois*, 497 U.S. 62, 74, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (applying strict scrutiny to patronage system requiring membership in or support of the Republican Party). In the instant case, the court again

assumes that the government's interest in raising and maintaining a military is a compelling one. Therefore, the court must consider the second prong of strict scrutiny analysis: narrow tailoring.

The Solomon Amendment is not narrowly tailored to serve the government's compelling interest. As the court laid out more fully above, DoD fails to offer any proof, despite any such proof being within its control, that it could carry its burden of narrow tailoring. *See* Section IV.C.1.d, *supra.* It offers neither proof that the Solomon Amendment substantially advances the government's interests, nor proof that it is the least restrictive means. *See Landell*, 382 F.3d at 126.

Therefore, the Solomon Amendment is not narrowly tailored to advance a compelling government interest, and thus unjustifiably burdens the Faculty Members' First Amendment right of expressive association. The court concludes that there are no material issues of fact, and the Faculty's motion for summary judgment on their First Amendment freedom of association ground is granted as a matter of law.

### 3. Faculty's Fifth Amendment/Educational Autonomy Claim

 As a second basis for their unconstitutional conditions claim, the Faculty Members assert that the Solomon Amendment violates their right to educational autonomy. Framing it as a substantive due process right under the Fifth Amendment, the Faculty describe it as the right "to ban discriminatory conduct from all of the Law School's activities in order to protect their students and to create the environment necessary to carry out the Faculty Members' educational mission." Mem. Supp. Summ. J. at 29. The Faculty cite a handful of cases that they argue recognize "a faculty's autonomous governance of the [university's] educational en-

188

vironment," *id.* at 30, as a right " 'implicit in the concept of ordered liberty.' " *Id.* at 29 (quoting *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937), *overruled on other grounds by Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969)). This argument reaches too far.

The substantive due process rights recognized in *Palko* are those that "have been found to be implicit in the concept of ordered liberty ...." 302 U.S. at 325, 58 S.Ct. 149; *see also Local 342, Long Island Pub. Serv. Employees v. Town Bd. of the Town of Huntington,* 31 F.3d 1191, 1196 (2d Cir.1994). They are " 'principle[s] of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' " *Id.* (quoting *Snyder v. Massachusetts,* 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934), *overruled in part on other grounds by Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)). The Supreme Court has warned, however, that federal courts should be "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (citing *Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 225–26, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985)); *see also Interport Pilots Agency, Inc. v. Sammis,* 14 F.3d 133, 144 (2d Cir. 1994). The *Collins* Court explained that "[t]he doctrine of judicial self-restraint requires [federal courts] to exercise the utmost care whenever [they] are asked to break new ground in this field." 530 U.S. at 125, 120 S.Ct. 2090; *see also Local 342,* 31 F.3d at 1196.

The cases cited by the Faculty provide for a substantive due process right both to educate and to an education. *See, e.g., Meyer v. Nebraska,* 262 U.S. 390, 400, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). A school's right to educate clearly includes the right to make determinations concerning the school's curriculum and qualifications necessary for membership in the student body. *See id.* (holding that teacher had the fundamental right to teach the German language to his students); *see also Grutter,* 539 U.S. at 328–29, 123 S.Ct. 2325 (granting as a result of the university's "special niche in our constitutional tradition," a degree of deference to "a university's academic decisions" including its determination that student body diversity constitutes a compelling interest for the purposes of student admissions); *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 272–73, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (holding that a school does not violate a student's First Amendment rights when it makes editorial decisions for a publication printed pursuant to a class within its curriculum); *Ewing,* 474 U.S. at 225, 106 S.Ct. 507 (showing "great respect" for a university's determination of "a genuinely academic decision," such as when a student should be dropped from an academic course of study). The Supreme Court has also extended deference to an educational institution's decision to promote extracurricular student speech through content neutral funding of student organizations. *See Bd. of Regents of the Univ. of Wisconsin Sys. v. Southworth,* 529 U.S. 217, 232–33, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000).

However, the scope of this "right to educate" is not as broad as the Faculty suggest. The American "concept of ordered liberty" is not implicated when the federal government passes a law governing who may participate in college recruiting programs. Such a law does not "violate a 'principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' " *Palko,* 302 U.S. at 325, 58 S.Ct. 149. The court is aware of

no case law that compels the conclusion the Faculty urge.

The Faculty have urged the court to view the Supreme Court's decision in *Lawrence v. Texas,* 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), as, *inter alia,* calling into question the constitutionality of the "Don't Ask, Don't Tell" policy. This court reads *Lawrence* as limited to the most private of personal, sexual relationships between consenting adults. *See* 539 U.S. at 573–74, 123 S.Ct. 2472. According to the *Lawrence* Court:

> ... our laws and traditions afford constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education .... "These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life."

*Id.* (quoting *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 851, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)). No "most intimate and personal choice" is implicated in recruiting in an educational environment.

Therefore, the court finds that this is precisely the type of situation in which it should exercise the judicial restraint appropriate in the substantive due process area. Furthermore, because the plaintiffs' substantive due process educational autonomy claim is functionally a First Amendment academic freedom claim, *see Keyishian v. Bd. of Regents of the Univ. of the State of New York,* 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) ("[Academic] freedom is ... a special concern of the First Amendment ...."), the court need not create, and must forgo creating, a

new substantive due process right, *see County of Sacramento v. Lewis,* 523 U.S. 833, 842, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (" '[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims' ") (quoting *Albright v. Oliver,* 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994)).

For the foregoing reasons, the court grants the DoD's motion to dismiss the Faculty's Fifth Amendment claim and denies as moot the Faculty's motion for summary judgment on that claim.

## V. CONCLUSION

For the reasons stated above, the plaintiffs' motion for summary judgment [Dkt. No. 34] is granted in part and denied in part, and the still-*pending* defendant's motion to dismiss [Dkt. No. 12] is granted in part and denied in part. The defendant's motion to dismiss the plaintiffs' First Amendment compelled speech and association claims is **DENIED** as moot, and the plaintiffs' motion for summary judgment on those claims is **GRANTED**. The defendant's motion to dismiss the plaintiffs' Fifth Amendment claim is **GRANTED**, and the plaintiffs' motion for summary judgment on that claim is **DENIED**. The plaintiffs' motion for summary judgment on their statutory compliance claim is **DENIED**, and the court *sua sponte* **GRANTS** summary judgment to the defendant on that claim. Defendant's request pursuant to Rule 56(f) is **DENIED**.

Accordingly, the Solomon Amendment is hereby declared unconstitutional as applied, and the defendant is enjoined from enforcing it against Yale University based upon Yale Law School's Non–Discrimina-

190

tion Policy. The Clerk is ordered to close the case.

**SO ORDERED.**